CHARLES R. JONES, Judge.
11 This is an appeal of a judgment denying a petition for the intrafamily adoption of G.B.P.[1] brought by Raymond C. Mulvi- *420 hill[2], pursuant to Louisiana Children’s Code article 1245. We affirm the judgment of the district court.
This case involves the denial of an intra-family adoption of 8 ⅜ year old G.B.P. Trida Fanning Spears (now Mrs. Tricia Mulvihill), the mother of G.B.P., met Ap-pellee, Larry B. Potter, in 1999. Subsequently, Mrs. Mulvihill and Mr. Potter moved in together. On December 14, 2001, G.B.P. was born. Ms. Mulvihill and Mr. Potter were never married. When G.B.P. was three (3) months old, they separated. After the separation, Ms. Mulvihill claimed that Mr. Potter did not pay child support for G.B.P. for a period in excess of eight (8) years. Ms. Mulvihill continued to work to pay for G.B.P.’s clothing, diapers, and to provide a home for him. G.B.P. received free formula from WIC and Medicaid insurance [ ¡¡coverage.
However, the relationship became contentious after a short while. By March 2002, Mrs. Mulvihill abruptly told Mr. Potter to move out of the house they had shared. She gave no explanation for why she wanted him out of the house. In October 2002, Mr. Potter agreed to a Consent Judgment requested by Mrs. Mulvi-hill, in the alleged belief that Mrs. Mulvi-hill would thereafter allow him to see G.B.P. whenever he wanted. Mr. Potter was unrepresented at the time.
Following this change in Mrs. Mulvihill’s domestic arrangements, she allegedly began to make access to G.B.P. more difficult for Mr. Potter. He was forbidden to visit with or even speak with G.B.P. alone, and was only allowed supervised visitation at either Mrs. Mulvihill’s house or her mother’s house. These visits were limited to 45 minutes to an hour in duration. Mr. Potter allegedly requested visitation with G.B.P. in the months following his breakup with Mrs. Mulvihill, but he was allegedly only allowed visitation on her terms, and then only rarely at best.
Subsequently Mrs. Mulvihill met Mr. Mulvihill. They dated and then moved in together for some time. On January 6, 2006, Mr. Mulvihill and Mrs. Mulvihill were married. On October 29, 2009, Mr. Mulvihill filed a petition for intrafamily adoption, seeking to adopt G.B.P., and to change the name of the minor child to “[G.B.] Mulvihill.” Mrs. Mulvihill consented to the adoption of G.B.P. by his stepfather.
On November 25, 2009, Mr. Potter filed an opposition to the intrafamily adoption. An attorney, Rennie Buras, was appointed to represent the minor child. The hearing was scheduled to be heard on December 10, 2009, and was continued by Mr. Potter’s counsel due to a previously scheduled matter. A pre-hearing |sconference was scheduled by the district court on January 28, 2010, and subsequently a contradictory hearing was held on March 11, 2010.
At trial, the Mulvihills argued that “all attempts by Mr. Potter to exercise his parental rights have failed, even though he made reasonable efforts to exercise them.” The Mulvihills represented that Mr. Potter had very little contact with G.B.P., and only attempted to visit his son approximately once every three to six months. They further argued that when Mr. Potter did visit with G.B.P., Mrs. Mulvihill allowed him to visit as long as he wanted; *421 however, Mr. Potter left after 20 minutes into the visit, saying that he had other things to do or that had to go to work.
On April 26, 2010, the district court rendered Judgment denying Mr. Mulvihill’s request for a stepparent adoption. In its reasons for judgment, the district court opined that
Mr. Potter made reasonable efforts to communicate and visit with [G.B.P.] throughout [G.B.P.j’s life, however, such-attempts were thwarted by the mother. This court further finds that Mr. Potter did not refuse nor fail to visit, communicate or attempt to communicate with [G.B.P.] without cause for a period of at least six (6) months.
As to whether the adoption in in the best interest of G.B.P., the district court determined that,
[t]he totality of the evidence supports a finding that it would not be in the best interest of the child to terminate Mr. Potter’s parental rights and grant the Petition for Intrafamily Adoption.
This timely appeal followed, and the Mulvihills raise the following three (3) assignments of error on appeal:
|41. The trial court erred in finding that Appellee attempted to communicate with G.B.P. at least once every six months since December 2004;
2. The trial court erred in finding that it was not in the best interest of G.B.P. to be adopted by Appellant; and
3. The trial court erred in failing to apply an analysis of Louisiana Children’s Code Article 1138, to determine that Appellee had not established his parental rights because he had not demonstrated a manifestation of his substantial commitment to parental responsibilities.

DISCUSSION

It is well settled that “the standard of appellate review for factual determinations is the manifest error-clearly wrong standard, which precludes setting aside a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety.” In re Succession of Stamm, 2009-1469, p. 5 (La.App. 4 Cir. 7/14/10), 43 So.3d 326, 329 citing Rando v. Anco Insulations Inc., 2008-1163, p. 20 (La.5/22/09), 16 So.3d 1065,1082.
Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently. Upon full review of the record, the appellate court may not reverse reasonable findings, even if convinced it would have weighed the evidence differently sitting as the trier of fact.
Clarkston v. Louisiana Farm Bureau Cas. Ins. Co., 07-0158, p. 24 (La.App. 4 Cir. 7/2/08), 989 So.2d 164, 182, writ denied, 08-1768 (La.10/31/08), 994 So.2d 539.
The party petitioning the court for adoption carries the burden of proving a parent’s consent is not required under the law. In re: Fleming, 2001-1403 (La.App. 5 Circuit 4/30/02) 817 So.2d 371, 376. Furthermore, pursuant to Ch.Code Art, 1245, a parent’s consent to the adoption is not required if he “failed to visit, | ¡¡communicate or attempt to communicate with the child without just cause for a period of six months.”
In the context of intrafamily adoption, the best interest of the child is determined by the court engaging in a “dual focus” analysis. W.E.B. Applying for Adoption, 2007-1395, p. 4 (La.App. 3rd *422 Cir. 3/5/08), 980 So.2d 123, 127. Even if the technical requirements for dispensing with the natural parent’s consent are met, the primary consideration in adoption proceedings is whether the adoption is in the best interest of the child. In re: Miller, 95-1051, 95-1052, p. 5 (La.App. 1st Cir. 2/15/05), 665 So.2d 774, 777. Further, the legislature has mandated that when a court has granted custody to the parent married to the stepparent petitioner, there shall be a rebuttable presumption that the adoption is in the best interest of the child. Ch.Code Art. 1255 B.
Furthermore, La. Ch.Code art. 1193 requires the consent of the biological father for an intrafamily adoption. La. Ch.Code art. 1193, entitled, Persons whose consent or relinquishment is required, provides:
Unless rights have been terminated in accordance with Title X or XI, consent to the adoption of a child or relinquishment of parental rights shall be required of the following:
(1) The mother of the child.
(2) The father of the child, regardless of the child’s actual paternity, if any of the following apply:
(a) The child is a child born of the marriage in accordance with the Louisiana Civil Code or its legal equivalent in another state.
(b) The father is presumed to be the father of the child in accordance with the Louisiana Civil Code or its legal equivalent in another state.
(3) The alleged father of the child who has established his parental rights in accordance with Chapter 10 of Title XI.
|b(4) The biological father of the child whose paternity has been determined by a judgment of filiation and who has established his parental rights in accordance with Chapter 10 of Title XI.
(5) The custodial agency which has placed the child for adoption, except that the court may grant the adoption without the consent of the agency if the adoption is in the best interest of the child and there is a finding that the agency has unreasonably withheld its consent.
However, in certain limited circumstances set forth in article 1245, his consent may not be required, as art. 1245 provides in pertinent part:
Art. 1245. Parental consent not necessary; burden of proof
A. The consent of the parent as required by Article 1193 may be dispensed with upon proof by clear and convincing evidence of the required elements of either Paragraph B, or C of this Article.
C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exists:
(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.
(2) The other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.
In the instant matter, there is some dispute as to whether Mr. Potter had contact with his son since Christmas 2004. Particularly, the controversy in this case concerns whether Mr. Potter made at least one attempt to communicate with G.B.P. every six months since December 2004.
In their first assignment of error, the Mulvihills argue that Mr. Potter has *423 not visited his son G.B.P., since December 2004, a period of over five and one half 17years. Moreover, the Mulvihills argue that Mr. Potter gave no real reason as to why he stopped visiting his son, except that he alleged that he had not been allowed to visit the child. The Mulvihills argue that Mr. Potter’s claim lacks veracity since he merely alleged that he went to Ms. Mulvihills’ home, knocked on the door and left when there was no answer. They also contend that Mr. Potter took no legal action, he produced no phone records, nor any other documentation which purported to establish he actually attempted to communicate with his son.
Still further, the Mulvihills argue that Mr. Potter gave conflicting testimony during cross examination regarding his attempts to visit with G.B.P. Particularly, they argue that Mr. Potter testified that he had stopped going to Ms. Mulvihills’ house in 2005, and that he gave no further explanation concerning his change in testimony.
The Mulvihills also argue that while Mr. Potter claims to have visited his son, he never brought presents to his son. They argue that Mr. Potter’s inconsistent efforts to buy presents for G.B.P., while not sending or delivering them to the child, cannot be considered as an attempt to communicate under the law. Still further, they argue that his testimony was that he stopped going to Ms. Mulvihills’ house, not that he was stopped.
The Mulvihills also argue that Mr. Potter failed to introduce any evidence that he sent G.B.P. [greeting] cards. They argue that in 2005, G.B.P. was only three years old and could not read. They argue that Mr. Potter could not recall, with certainty, the holidays he sent cards to G.B.P.
Furthermore, the Mulvihills argue that based on the totality of the evidence presented at trial, Mr. Potter did not make a sufficient showing that he made at | ¡¡least one attempt to communicate with G.B.P. every six months. The Mulvihills maintain that:
[W]hen Mr. Potter was faced with the impending adoption, he concocted the story about knocking on the door and the sending of the cards knowing that those actions could not be disproved by physical evidence and that it would come down to his word against [theirs].
The Mulvihills argue that the instant case is similar to the facts in In re: C.E.M., III, 09-787 (La.App. 5 Cir. 1/26/10), 31 So.3d 1138. In re C.E.M., III, a child’s stepfather, along with the child’s biological mother, filed a petition for intra-family adoption seeking to have child adopted by stepfather. The child’s biological father filed an opposition to petition for intrafamily adoption. In its decision, the Louisiana Fifth Circuit determined that the biological father’s actions were insufficient to require his consent to the adoption and held: (1) the statute placing the burden of proof on petitioner, rather than statute placing the burden of proof on the child’s alleged or adjudicated father to establish parental rights at the hearing of the opposition, was applicable; Id. p. 6, 31 So.3d at 1141(2) the petitioners met then-burden of proving that biological father’s consent to the adoption was unnecessary based on his failure to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months; Id. p. 8, 31 So.3d at 1142; and (3) the adoption was in child’s best interest. Id. p. 7, 31 So.3d at 1142.
Mrs. Mulvihill argues that she has lived in the same home for G.B.P.’s entire life, and has maintained the same employment with Gordon’s of Metairie. She argues that Mr. Potter testified that he never attempted to call her at work or contact *424 her mother. Moreover, she contends that Mr. Potter had no telephone records to substantiate any telephone calls to Mrs. Mulvihill.
|9The Mulvihills also recalled two incidents in 2007 when Mr. Potter saw G.B.P. with the Mulvihill family: once at Skate Country, and again at Christ the King Fair. However, they argue that he did not make any attempts on either occasion to communicate with G.B.P. Further, they argue, Mr. Potter did not make any attempts to contact Ms. Mulvihill at her place of employment or at any family members’ homes, and made no attempts to visit G.B.P. from December 2004 until after these proceedings began.
The Mulvihills argue that Mr. Potter has failed to provide any financial support for G.B.P., and that he paid child support for his daughter, Brianna Potter, before G.B.P. was born, and continued to pay child support for his daughter until he requested the court terminate the child support prior to the opposition hearing in this matter.
After their separation, Mrs. Mulvihill indicated that she purportedly encouraged Mr. Potter to visit his son, and to provide consistency in life. However, she claimed that Mr. Potter failed to visit his son on a regular basis making only approximately ten attempts to contact his son during his first year of life. The Mulvihills argue that Mr. Potter’s assertion that he was somehow unable to communicate on any level “shows either an inexcusable lack of initiative on his part or an attempt to make a mockery of these proceedings.”
The Mulvihills argue that G.B.P. is now in a very stable, happy, structured and safe environment with his mother and Appellant. G.B.P. was approximately 1½ years old when Mr. and Ms. Mulvihill met and began dating. Mr. Mulvihill resided in the home with G.B.P. and Mrs. Mulvihill from September 2005 (four months prior to their wedding date), and the couple married on January 6, 2006, when G.B.P. was 4 years old. The Mulvihills argue that Mr. Mulvihill is the only |10father G.B.P. can remember, they love each other very much, and Mr. Mulvihill considers G.B.P. his son. Further, G.B.P. calls him “Ray Ray” and “dad.” Mr. Mulvihill plays outside with G.B.P., plays football with him, attends soccer games, and they ride four-wheelers together.
Mr. Mulvihill is an active participant in G.B.P.’s school functions and activities. He also takes G.B.P. on vacations, takes him fishing, and takes him to the zoo. He loves and nurtures G.B.P. Furthermore, the Mulvihills argue that Mr. Mulvihill has continuously maintained G.B.P. on his health insurance since he and Mrs. Mulvi-hill were married.
Finally, the Mulvihills argue that Mr. Mulvihill is committed to both Mrs. Mulvi-hill and G.B.P., and has proven himself to be fully committed to his self-imposed parental responsibilities over the past 8 years of G.B.P.’s life. They content that Mr. Mulvihill is “ready and willing to accept full responsibility for G.B.P. as if he was born to him and fully understands that he would be responsible for his mental, physical and financial well-being.”
Mr. Potter argues that he has attempted to see his son. In fact, he argues that in February 2002, during the time when G.B.P. was covered by Mr. Potter’s health insurance plan, he underwent surgery at Children’s Hospital and remained as an inpatient for approximately three nights. From the moment G.B.P. was admitted to the hospital, Mr. Potter never left his side — apart from the time he returned home to get clothes for himself and G.B.P. for the hospital stay. Mr. Potter thereafter remained at the hospital throughout *425 G.B.P.’s stay, sleeping there overnight for three nights. Mr. Potter argues that Mrs. Mulvihill, on the other hand, left the hospital daily and never stayed with G.B.P. overnight while he was at Children’s. |nWhen G.B.P. was discharged, Mr. Potter was the one who was with him and signed the paperwork, and then drove G.B.P. home.
Mr. Potter also argues that following the change in Mrs. Mulvihill’s domestic arrangements, she began to make access to G.B.P. more difficult for Potter. He was forbidden to visit with or even speak with G.B.P. alone, and was only allowed supervised visitation at either Mrs. Mulvihill’s house or her mother’s house. These visits were limited to 45 minutes to an hour, and that Mr. Potter repeatedly requested visitation with G.B.P. in the months following his breakup with Mrs. Mulvihill, but Mrs. Mulvihill only allowed it on the terms set forth above, and then only rarely.
Mr. Potter also argues that his visits with G.B.P. continued with decreasing frequency, due to Ms. Mulvihill’s lack of cooperation, until December 2004, when Mr. Potter was allowed the only unsupervised outing he has had with G.B.P. since Mrs. Mulvihill asked him to move out. Mr. Potter spent two hours with G.B.P., and memorialized the special occasion by photographing G.B.P. with other family members. Thereafter, Mr. Potter — who by then was engaged to his current wife, Rachel — visited G.B.P. on Christmas Day, 2004, and gave G.B.P. both his birthday and Christmas presents. Mr. Potter indicated that both Mr. and Mrs. Mulvihill made him feel unwelcomed during this visit.
That Christmas of 2004 was the last time Mrs. Mulvihill allowed Mr. Potter to see them son, Mr. Potter argues, and that Mrs. Mulvihill frankly admitted that after 2004, she did nothing to facilitate a relationship between Mr. Potter and G.B.P. Mr. Potter argues he nevertheless persisted and continued to try to maintain contact, calling Mrs. Mulvihill’s house at least once a month and going by her house every six to eight weeks in an attempt to talk to G.B.P. Mrs. Rachel Potter 1 i2testified that she frequently witnessed Mr. Potter making telephone calls to Mrs. Mulvihill’s house and leaving messages, and twice accompanied Mr. Potter on visits to Mrs. Mulvihill’s house to try to visit with G.B.P. On no occasion did Mrs. Mulvi-hill accommodate Mr. Potter’s desire to see his son, or even open the door.
Mr. Potter testified that his visits with G.B.P. allegedly decreased in frequency, due to Mrs. Mulvihill’s lack of accommodating him, up until December 2004, when Mr. Potter was allowed the only unsupervised outing he has had with G.B.P. since Mrs. Mulvihill asked him to move out.
Mr. Potter testified that he was not allowed into G.B.P.’s life, and that any time he tried to get into G.B.P.’s life, he would be blocked by Mrs. Mulvihill. Mr. Potter married his current wife, Rachel, on March 12, 2005. He testified regarding an event which occurred in early March 2005, prior to his wedding. Mr. Potter testified that he called Mrs. Mulvihill to discuss having G.B.P. be a part of his then-upcoming marriage. Mr. Potter points out that during trial, while Mrs. Mulvihill initially denied that she had any contact whatsoever with Mr. Potter after 2004, she subsequently changed her testimony and conceded that Mr. Potter had called her about G.B.P. being in his wedding in March 2005.
Mr. Potter argues that he wanted G.B.P. to attend and be a part of the wedding. He even testified that he invited Mr. and Mrs. Mulvihill to attend the wedding in order to make it easier for G.B.P. to attend. Initially, Mrs. Mulvihill agreed, and Mr. and Mrs. Potter bought matching out *426 fits for G.B.P. and their other son, but Mrs. Mulvihill refused to attend the wedding and ultimately refused to let G.B.P. be a part of, or even attend, his father’s wedding.
|1sHe also testified that he purchased Christmas gifts for G.B.P. in 2005, but Mrs. Mulvihill would not allow him to see G.B.P. or give them to him. Mr. Potter testified that since that time, he has purchased birthday and Christmas presents for G.B.P. every year, and has kept them in storage until such time he will finally be able to give them to him. He testified that he also regularly sends G.B.P. cards approximately four times a year — on his birthday, and on holidays such as Christmas, Halloween, Valentine’s Day and Easter.
Because the record before us establishes that there has been a contentious relationship between the biological parents which may have interdicted Mr. Potter’s opportunities to visit with his son as much as he would have liked allegedly because of the acts or omissions of Mrs. Mulvihill, we cannot say that the district court erred in its finding that an interfamily adoption was not warranted in the instant case. We cannot say that the district court is manifestly erroneous or clearly wrong in its factual determination that it was not the fault of Mr. Potter that he had infrequent contact with G.B.P. Therefore, this assignment of error does not have merit.
In his second assignment of error, Mr. Mulvihill argues that the district court erred in finding that it was not in the best interest of G.B.P. to be adopted by Mr. Mulvihill, Mr. Potter has testified that he has not visited with G.B.P. for over five and one half years. On the other hand, Dr. Van Beyer, an expert on custody evaluations and parent-child bonding, testified that if the adoption were granted, G.B.P. would not feel any loss concerning his relationship with his biological father. Moreover, Dr. Van Beyer testified that G.B.P. relates to Mr. Mulvihill “exactly as a little boy would relate to his father.” Further, she opined that G.B.P. |14is firmly attached psychologically Mr. Mulvihill, and that the adoption would be in G.B.P.’s psychological best interest.
The Mulvihills argue that Mr. Potter, who opposes this adoption, has put forth no evidence or any testimony as to why it is not in G.B.P.’s best interest to be adopted by Mr. Mulvihill, “the man who has assumed the role of Daddy in his life.” However, once again, we cannot say that the district court’s factual determination of the best interest of G.B.P. is to oppose this adoption. Thus we find no merit to this assignment of error.
In his final assignment of error, Mr. Mulvihill argues that the district court erred in failing to apply an analysis of Louisiana Children’s Code Article 1193, to determine whether Mr. Potter had not established his parental rights because he had not demonstrated a manifestation of his substantial commitment to parental responsibilities.
La. Ch. C. art. 1193, entitled Persons whose consent or relinquishment is required, provides:
Unless rights have been terminated in accordance with Title X or XI, consent to the adoption of a child or relinquishment of parental rights shall be required of the following:
(1) The mother of the child.
(2) The father of the child, regardless of the child’s actual paternity, if any of the following apply:
(a) The child is a child born of the marriage in accordance with the Louisiana Civil Code or its legal equivalent in another state.
(b) The father is presumed to be the father of the child in accordance with the Louisiana Civil Code or its legal equivalent in another state.
*427 (3) The alleged father of the child who has established his parental rights in accordance with Chapter 10 of Title XI.
_Jj¿(4)The biological father of the child whose paternity has been determined by a judgment of filiation and who has established his parental rights in accordance with Chapter 10 of Title XI.
(5) The custodial agency which has placed the child for adoption, except that the court may grant the adoption without the consent of the agency if the adoption is in the best interest of the child and there is a finding that the agency has unreasonably withheld its consent.
In the instant matter, Mr. Mulvihill argues that although Mr. Potter is named on the birth certificate and considered an adjudicated father under La. Ch.Code art 1193, he still must prove that he manifested a substantial commitment to his parental responsibilities under Article 1138 of the Louisiana Children’s Code to be considered a parent whose consent is required for the adoption.
While Mr. Mulvihill argues that it was stipulated that Mr. Potter was present at the birth of G.B.P. and that he resided with G.B.P. and his Mrs. Mulvihill for three months after G.B.P.’s birth, he argues that Mr. Potter failed to provide financial support for G.B.P. Thus, under the provisions of Article 1138(B)(£), Mr. Mulvi-hill argues that Mr. Potter failed to provide consistent support for G.B.P.
However, Mr. Potter responds that no court order for support has ever existed. However, a court order of support is not required to establish his parental rights. The only requirement is a showing of consistent contributions of support before, during, and/or after birth of the child.
The district court denied Mr. Mulvihill’s request for a stepparent adoption. The district court found that the record in the instant matter does not demonstrate that Mr. Potter failed to take any action in the previous five years to assume any parental responsibility.
La. Ch.Code art. 1245(C)(2) required Mr. Mulvihill to prove by clear and convincing evidence that Mr. Potter failed to visit, communicate or attempt to ^communicate with G.B.P. The district court found that Mr. Mulvihill failed to carry his burden, concluding instead that Mr. Potter made reasonable attempts to visit and communicate with his son G.B.P. throughout G.B.P.’s life, but that both Mrs. Mulvihill and Mr. Mulvihill deliberately thwarted Mr. Potter’s efforts. The parties presented the district court with two opposing views of the evidence, and the district court’s factual findings in this case were based on its credibility decisions in resolving witness testimony that was in direct conflict. “Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review....” Clarkston v. Louisiana Farm Bureau Cas. Ins. Co., 07-0158, p. 24 (La.App. 4 Cir. 7/2/08), 989 So.2d 164, 182, writ denied, 08-1768 (La.10/31/08), 994 So.2d 539, citing Syrie v. Schilhab, 96-1027, p. 4 (La.5/20/97), 693 So.2d 1173, 1176. Furthermore, “[ujpon full review of the record, the appellate court may not reverse reasonable findings, even if convinced it would have weighed the evidence differently sitting as the trier of fact.” Id. Thus, we cannot say that the district court erred in denying the petition for intrafamily adoption.

DECREE

For the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED.

. Pursuant to Uniform Rules, Courts of Appeal, Rule 5-2, entitled Confidentiality:
To insure the confidentiality of a minor who is a party to or whose interests are the subject matter in the proceedings listed in Rule 5-1 (a) or (c) above, initials shall be used in all filings and in opinions rendered by the court of appeal to protect the minor's identity.
*420 Thus, for the sake of the privacy of the minor, only his initials will be used throughout this opinion.

. This is an appeal by Mr. Mulvihill. Although Mrs. Mulvihill is not an appellant, her status as biological mother of the minor child are relevant to the fact of this case, and, she and Mr. Mulvihill will be mentioned in this matter as "the Mulvihills” when referred to collectively.