CARAWAY, J.
|Jn this intrafamily adoption case, the unwed biological father enlisted in the Navy when the child was one year old and remained in military service for five years. The child’s mother married the petitioner/stepparent, who later brought this action to adopt the child without the consent of the father. The child was four when the suit was filed. Petitioner asserted that the father refused or failed to visit, communicate or attempt to communicate with the child for a period of six months before the action. The father opposed the adoption and the termination of his parental rights, claiming that petitioner and the child’s mother prevented him from fostering a relationship with the child. He also asserts that the Servicemembers Civil Relief Act provides him protection from this action during the time of his military service. The trial court rendered judgment in favor of petitioner finding no just cause for the father’s lack of communication with the child and authorizing the adoption. Finding manifest error concerning the determination of just cause, we reverse.

Facts

On May 11, 2007, the child K.B. was born out of wedlock to Alexis Brianne Puckett (“Brianne”) and Jonathan Brown (“Jon”), who were both teenagers. Jon and Brianne never subsequently married, but Jon’s name appears on the child’s birth certificate. For the first year after the child’s birth, the child lived with Brianne at Brianne’s mother’s house. During the first three months of KB.’s life, Jon consistently visited the child, with visits the next three months becoming less frequent.
| ¡Around March or April 2008, Jon began considering his options for joining a branch of the United States military. He claimed that he was seeking to provide a better life for K.B. At the time, he was in his first year in college. He was attempting to help provide a few things for K.B., and would drive to the Shreveport area to visit K.B. and Brianne. Jon thought he was not making enough money to stay in school and to help provide for K.B. During that time, he worked delivering pizza, and at one point, worked at a casino.
When Jon initially brought up the idea of joining the military, Brianne was unsup-portive. Nevertheless, on May 27, 2008, Jon enlisted in the Navy and was stationed in Connecticut after boot camp. Jon did not tell Brianne that he had enlisted. Before he left for Connecticut, Jon had a paternity test done, which concluded he was the biological father and subsequently had child support payments set up through the state. The support obligation was slightly over $200 per month and has been regularly paid out of his Navy pay.
Jon’s service in the Navy lasted until his discharge on May 27, 2013. During that time, Jon was a crewman on a nuclear submarine. He spent roughly 70% of his time during any given year underwater. Parts of Jon’s deployment included actual voyages and fast cruises, when the crew of the submarine board the vessel and simulate a voyage without ever leaving port. At other times he had dry dock duties, which included watches and other dry land duties. Jon claims that while on land, he worked long hours, but he did have occasional computer access. Jon had a maximum of 30 and a minimum of 21 days of leave per year. Throughout his service, he would 13have leave roughly every six months around Christmas and the end of May or early June. These leave periods typically lasted about one and a half weeks each. When on leave, Jon would come to the Shreveport area.
*1267 Jon’s visitation of K.B. began to taper off in the fall of 2007. Jon attributes this diminished visitation to Brianne’s finding out that Jon was dating Mary Timmons. However, Jon did visit K.B. in December 2007. Between December 2007 and when he joined the military in late May 2008, he saw the child one or two more times, including a visit at a duck pond in February 2008.
In September 2008, Brianne married Jeremy Puckett (“Jeremy”). Over time, Jeremy began to become more of a father figure to K.B., and K.B. began referring to Jeremy as “Daddy.” Also, over time, Jeremy began to see himself as KB.’s father, and went to father-daughter type events. Jeremy considers himself as the person who provides for both K.B. and Brianne and who has over time asserted more control over major decisions involving K.B.
During Jon’s military service, his visits, communication, and attempts to communicate with K.B. were sparse. Jon’s first leave was in December 2008, when he came back to the Shreveport area. Jon sent a letter to Brianne, through his sister, because he did not know Brianne’s address. His prior experiences with Brianne were that she often moved with her mother, Tammie Hill, when she still lived with her. Although he knew the physical location of Tammie’s home, he did not know the address. Once Jon’s sister learned where to send the letter, she sent it by certified mail. In the letter, Jon states that he is writing “because [he] would like to see [K.B.] at least one time when [he] comes home.” He goes on to state: “I can pick [K.B.] up |4anytime at your convenience between Saturday, December 27th and the following Thursday. Any of those days will be good[,] just let me know. I do not have a return address right now[,] so you can mail or email my sister Shannon your reply.”
Shortly before the letter was sent, Jon’s sister Shannon contacted Brianne through social media about having lunch and visiting K.B. Brianne declined, stating,
[S]he has everyone she’ll ever need and she has an amazing father [Jeremy] who will and has done everything he could ever do her and also two set grandparents and uncles & aunts that love her more than anything.... so no I don’t think it would be right to confuse her on whos family and whos not.... thanks for the invite anyways sorry things couldnt of been different.... I don’t only blame you I blame your entire family [sic, generally]! (ellipses in original)
Shannon never visited with K.B. after this response.
Further, that December, Brianne and her mother contacted the police to pursue misdemeanor carnal knowledge of a juvenile charges. Jon was a little over three years older than Brianne when she became pregnant. He was also over 18 years old at that time. The investigating detective, Angie Wilhite, testified that Brianne and her mother specifically told her that they would drop the charges if Jon surrendered his parental rights to K.B. Jon also testified that Brianne made this quid pro quo offer. Nothing ever came of the charges.
Jon’s next leave period was in May 2009. In the months prior to that, Jon claims he did not have Brianne’s address. However, he did have access to a computer during that time. He states he had attempted to find Brianne by social media, but was unable to locate her. He claims he attempted to view her pages so that he might see pictures of K.B. When he was home for Isthis leave, he had a chance meeting with Brianne in a Shreveport store. Jon was with his fiancee, Mary Timmons, to buy a few items; Brianne was with Jeremy’s sister and K.B. At first, Jon and K.B. made eye contact and continued on their way; *1268 K.B. was not with Brianne at that moment. Jon claims that his relationship with Brianne at that point was strained. After the chance encounter, Brianne told Jeremy’s sister that she had seen Jon. Thereafter, Brianne returned to Jon with K.B. in tow. An argument ensued because Brianne was angry that Jon had not made contact on K.B.’s birthday, which was a few days prior. During the heated encounter, Jon attempted to give Brianne his contact information, including his cellphone number, so that Brianne might contact him, but Brianne refused to accept it. Brianne also did not provide her contact information to Jon.
On August 5, 2009, Jon sent a conciliatory email to Brianne that stated:
Okay, so I know it has been an interesting last two years (if that’s what you want to call it). We have both said and done a lot of things that at least I know Im not proud of, and looking back on several situations I can see different (and better) ways I could have went about every single one of them. We have let our personal feelings for each other become so horrible that we haven’t even been on speaking terms and the only person it has hurt is our [child]. I know I haven’t told you this near enough, but I want to be part of [K.B.’s] life. I want to be the father for her that mine never was, and the whole not telling you when I came in last time didn’t help things any ...; but this Navy thing isn’t forever. I’m doing what I have to do now to get back in school while still trying! to support [K.B.] [sic, generally].
Jon went on to say that it “kills [him] knowing that [K.B.] is growing up not knowing [him].”
Brianne responded to this email on October 19, 2009, with her phone number in the subject line. In her response, Brianne stated that she and |r, Jeremy had gone “back and forth over [Jon’s] email for the last 3 months.” She asked Jon to call when he came home in December because she felt computer communication on the subject was inappropriate. She said she “would like [Jon] to understand that just because [she] [was] talking to [Jon] [did] not mean [he] would get to see [K.B.].” She concluded: “[A]lso there is an important fact that needs to be understood, Jeremy is her father and Daddy and this WILL NOT CHANGE. Whether you are involved in [KB.’s] life has still not been decided.”
Shortly before Brianne’s response, Jeremy wrote a computer blog clearly referencing statements in Jon’s email to Brianne. In the blog post, Jeremy stated that it was to “someone I hate,” and that such person had no right even to contact Brianne. He concluded the message with a veiled threat directed at Jon or his family. Nevertheless, Jeremy claims this blog was directed to “deadbeat” dads in general, and more specifically, to his friend Raymond, who he says was complaining about paying child support.
Jon never called after Brianne’s email response and before his next scheduled leave in December 2009. He again returned to the Shreveport area for this leave period, but Jon did not visit K.B. or call Brianne. Jon states that this was due to the threatening blogs from Jeremy. On December 14, Jeremy again took to social media to vent after Brianne’s mother, Tammie Hill (“Tammie”), apparently added Jon as a friend on Facebook. Jeremy was perturbed by Tammie’s Facebook friendship with Jon. He concluded the blog with a sentence seemingly directed at Jon stating that he and Brianne would fight anyone when it came to “[their] daughter.”
|7Next, on January 25, 2010, Jon’s sister Shannon sent Brianne’s mother, Tammie, a Facebook message. In the message, she *1269 stated that she had Christmas gifts from the family to K.B. and asked how and when she could bring them to her. Tammie responded that she would love for Shannon to see K.B., and offered to try to arrange it. The next Facebook message between the two occurred on May 18, 2010. Shannon told Tammie that she had a few things for K.B. that she would drop by her house. Tammie responded by telling Shannon when she would be home.
About that same time, starting on April 3, 2010, Mary Timmons, Jon’s fiancee, began a Facebook exchange with Tammie Hill. In the message, Mary stated that she saw some pictures of K.B. that Tammie had posted on Facebook, and she asked if it was okay for Jon to send anything that K.B. might need or want to K.B. for her birthday. Tammie responded that it would be okay, and gave Mary her address. Mary asked for Tammie’s address because Jon did not want Jeremy to know he had sent the gifts. Tammie sent a message on April 6 stating that she received K.B.’s gifts from Jon.
Jon’s next leave period was June 2010. He came back to the Shreveport area for that visit. Brianne contacted Jon shortly before he came back about allowing Jon to visit K.B. At the time of these amicable email exchanges between Brianne and Jon, Brianne and Jeremy were separated.[1] On May 30, 2010, Brianne sent Jon an email in which she stated that she | Swas “sorry for all the wrong choices [she’d] made and how [she’d] handled [the] situation with [their] [child].” She revealed that she had told K.B. about Jon for the first time that night and that she handled it well for a three-year-old. She told Jon that K.B. also wanted to meet Jon. Brianne apologized for being rude in the past, but stated that she had not wanted the child to be hurt. Jon responded on June 2, 2010, stating:
I wanted you to know that the email you sent me made my day. I would like nothing more than to be helpful and be a part of [K.B.’s] life. I’m going to be coming home at the end of this month and I would really like to see her. Maybe we could go do something or I can stop by if that’s okay with you. I’m willing to go where ever [sic] to meet you. I’m sorry the email is so short, I’m at work and I’m about to have to go on watch, but this is my other email address. You’re welcome to email me on either of them anytime. Let me know what you think because I would love to work something out.
Brianne then responded by stating that she was “happy that [Jon] want[ed] to see [the] [child].” Brianne was separated from Jeremy at the time,[2] and she told Jon that she was staying at her grandmother’s house with K.B. She stated that she wanted Jon to have a good relationship with K.B. and that she would do anything it *1270 took to make it work “as long as [Jon] [was] willing to work for it as well.” Jon then responded that he would love to meet Brianne and K.B. somewhere. He told her that he would be in town from June 22 until June 29, 2010. Brianne then sent an email back stating that her mother told her that some of the birthday presents from Tammie were actually from Jon. She thanked him for the gifts and apologized that he had to go about sending the gifts anonymously through Tammie.
| ^¡Following this email exchange, Jon did meet up with K.B. and Brianne, and visited with them for about two hours at her apartment. The next day, he went shopping at the mall with K.B. and Brianne.[3] On June 30, 2010, Tammie Hill again sent Mary Timmons a Facebook message asking if Jon had made it home safe. She also told Mary that K.B. really enjoyed the visit with Jon and all the child would talk about was “daddy Jon and being on the boat.”
Next, on July 24, 2010, Jon sent Brianne a Facebook message. In it he stated:
Its [sic ] going to be fall pretty soon and I want to buy [K.B.] some new fall clothes but I don’t have your new [phone] number or address. You should still have mine so you can message me on here or text me, it’s either way and maybe sometime soon I would like to talk to [K.B.] on the phone if thats [sic ] okay with you.
Brianne responded by telling Jon that Jeremy would be messaging Jon about K.B. She said she hoped they would be able to discuss the matter like adults and that she would not put up with Jon and Jeremy fighting over “who is what to [K.B.].” Jon responded by stating he did not think it should be discussed on Facebook, and he agreed that it should be handled in an adult manner. He stated that he just wanted what is best for “[his] little girl.” Brianne then responded that Jon needs to understand boundaries like not referring to K.B. as “[his] little girl.” Then, Brianne messaged Jon asking what sort of clothes he was planning on buying K.B., and she told him that K.B. needed jeans. Jon replied that he could get some jeans, but still |lflmentioned he needed her address. Brianne then gave Jon her address and thanked Jon for his help.
On August 1, 2010, Jeremy sent Jon a Facebook message. He said he was writing to “get a few things straight,” and apologized if Jon took some of the things he says as “rude” but that was just “the way [he] [is].” He went on to state:
Me and Brianne will say what goes on with [K.B.] weather [sic] she has time with you or you come to our house or anything. Iam [sic] not saying that in the future you wont [sic] have say in things in her life but calling her your little girl and the pictures ... [sic ] I don’t [sic ] agree with that was one day and you know nothing about her.
He went on to say, regarding the gifts that Jon sends, he and Brianne will determine what K.B. gets and what she does not. He said, “I know you don’t [sic ] want to do this over a computer but I [sic ] really don’t [sic ] care to talk to you and its [sic ] not up to you to just talk to Brianne.” Jon responded by “blocking” Jeremy on Face-book.
Brianne was not pleased with Jon for this course of action. On August 6, 2010, she stated that Jon could “keep [his] clothes and [his] money” and whatever “wanna be father ideas [he] [had].” She *1271 concluded the message by ordering Jon to “Not Contact [her] Family Again.” Further, in retaliation, Brianne blocked Jon on Facebook.
After this breakdown in the parties’ communications, Jon went to see a Judge Advocate General (“JAG”) officer about what he needed to do to establish visitation rights. The JAG officer told him it was best to wait until his military service concluded to pursue those rights.
Sometime in February 2011, KB. came down with pneumonia. Jon saw posts about K.B. and her sickness on Tammie Hill’s Facebook page. He |nsent Tammie a message stating that he was worried about K.B. He said, “Brianne has made it pretty clear that she’s not going to give me any updates or accept any help, so I’m asking you please Tammy [sic] if there is anything I can do to help (medical bills, medicine, anything).” Brianne responded to Jon directly through her mother’s Face-book profile. She told Jon the details of K.B.’s condition, and she did not ask for any help from him. On February 24, Brianne, who had apparently unblocked Jon, sent him a Facebook message telling Jon that K.B. was doing better. She stated that KB. was asking more about Jon lately, and Brianne stated that she told K.B. that Jon was in the Navy and tried to explain the best she could. Jon responded by stating “if [KB.] ever wants to talk I always have my phone on me.” Jon then gave Brianne his phone number so that K.B. could call him. He stated:
I would really like to hear from her. Due to where I work, there are times when I might not receive a call or might not be able to answer it at that time but that doesn’t mean that I don’t want to talk. Have her call me when you get a chance.
Jon never got a response, and Brianne’s Facebook page was deactivated shortly thereafter.
Jon’s next leave period was in June 2011, but he did not visit with K.B. at that time. During Jon’s next leave in December 2011, he did not visit with K.B. Jon states that he had his sister Callie contact Brianne about visitation because his sisters had a better relationship with Brianne at that time. Additionally, Callie sent Tammie Hill a Facebook message on December 23, 2011. She told Tammie that her family had some Christmas gifts for K.B. She offered to meet Brianne alone to give her the gifts if she was uncomfortable with K.B. being present. Tammie responded by stating it | iawould be difficult for her to pick up the gifts because she now lived in Dallas. Callie then gave Tammie her phone number and asked Tammie to give Brianne the number so that she could just call or text message her when she was not busy. Brianne never responded because she was pregnant during that time. Jon’s next scheduled leave period between the December 2011 leave and the beginning of the adoption proceedings was September 2012.
On June 6, 2012, Jeremy Puckett filed a petition to adopt KB. A curator was appointed to answer the petition on Jon’s behalf and to locate him to notify him of the adoption proceedings. After locating Jon, the curator filed a motion to continue the proceedings on July 13, 2012, due to Jon’s military service. The motion was granted and the proceedings continued to September 10, 2012, when Jon would be on his next leave. At the hearing, the date for a trial on the petition was set to begin on November 26, 2012. The trial took place November 26-28, 2012, January 28, 2013, March 14, 2013, and April 19, 2013. The trial dates were set to coincide with when Jon would be able to attend the trial.
*1272 During the proceedings, an informal arrangement was established so that Jon might have weekly visitation with K.B. Jeremy and Brianne ultimately decided that they would allow Jon to talk to K.B. on the phone for five minutes every Thursday night, unless K.B. wanted to talk more. However, after initially allowing the phone calls, the arrangement between the parties broke down during the course of the litigation.
Following trial, the trial court decreed that Jon’s consent was unnecessary for the adoption because he failed to visit, communicate, or | ^attempt to communicate without just cause with K.B. for at least six months. The court noted that Brianne and Jon never fashioned a voluntary visitation arrangement and placed emphasis on Jon’s failure to seek legal advice to establish his visitation rights with the child. Therefore, the judge ordered the adoption be granted.
Following this ruling, Jon moved for a new trial and for the first time asserted the Servicemembers Civil Relief Act’s (“SCRA”), 50 App. U.S.C.A. § 526, provision tolling statutes of limitation in any legal proceeding, arguing that it suspended the six-month no-contact period during the time of his active duty military service. The trial judge found that the tolling provision did not apply to the case and denied the motion for new trial. Following this ruling, Jon appealed the decree of adoption and the denial of his motion for new trial.

Discussion

Jon’s arguments to this court emphasize that the burden of proof of the stepparent in this intrafamily adoption is to show by clear and convincing evidence that Jon has neglected his parental rights. The test under Louisiana Children’s Code Article 1245 (“Article 1245”) as set forth below centers on Jon’s alleged refusal or failure to visit, communicate or attempt to communicate with the child “without just cause” for a period of six months. Jon argues that he did maintain contact with K.B. since 2010 and before, but that his many other attempts to communicate with the child were “constantly thwarted” by Brianne and Jeremy. Additionally, Jon asserts the SCRA for its tolling period during his Navy service and additionally claims that his |umilitary service established “just cause” for any lack of attention to the fostering of this parent/child relationship.[4]
Intrafamily adoptions are authorized by La. Ch.C. arts. 1170 and 1243 when the adoption petition is filed by the stepparent and spouse of a custodial parent of the child. In re Intrafamily Adoption of L.M.C., 09-885, (La.App. 5th Cir.8/23/10), 39 So.3d 643. As a general rule, the consent of the biological father is required for an intrafamily adoption by the stepfather. Id.; La. Ch.C. art. 1193.[5] However, under Article 1245 the consent of the biological father may be dispensed with upon proof by clear and convincing evidence that the father has refused or failed to visit, communicate, or attempt to communicate with *1273 the child without just cause for a period of at least six months. La. Ch.C. art. 1245(C)(2). Such failure by a parent in fostering the parent/child relationship allows a stepparent, the spouse of the other parent exercising lawful custody of the child, to adopt the child. Id. Such intra-family adoption terminates parental rights of the biological parent failing to contact the child. See La. Ch.C. art. 1256.
To find “just cause,” a parent’s failure to visit or communicate with his child must be due to factors beyond his control. In re Morris, 39,523 (La.App.2d Cir.1/26/05), 892 So.2d 739. Louisiana courts have found that when a stepparent and the parent with custody have hindered the [ 1fiattempts of the natural father from visiting or communicating with his child, the father may be excused for otherwise failing to do so. In In re PS, 535 So.2d 1052 (La.App. 2d Cir.1988); Knapp v. Adoption of Cotten, 577 So.2d 241 (La.App. 1st Cir.1991); In re Mulvihill, 10-0826 (La.App. 4th Cir.1/19/11), 56 So.3d 418.
This court found in In re PS, supra, that the relationship between the parties had become contentious. This was due in part to the actions of the spouse of the man seeking adoption. The mother did not provide the natural father with her address. The natural father was prevented generally from visiting with the child. The few visits with the child by the natural father were limited due to the presence of the mother and stepfather. The father had persisted with futile attempts to visit the child during the holidays despite a distance between the parties. Although the father’s visits became sporadic, the court found his actions were not unreasonable under the circumstances and the adoption decree was overturned. Id. at 1056.
The jurisprudence illustrates the principle that when a stepparent or parent with custody fails to cooperate with the natural father’s attempts to visit and communicate with the child, then the father may demonstrate “just cause” under Article 1245 for failing to visit or communicate with the child.[6]
Before considering the SCRA, we first note that the Louisiana legislature in another context has recognized the effect of military service upon the normal lines of communication between parent and child. For the |1fiissue of disinherison, the legislature has recognized that active duty of the child is a type of just cause excusing the child’s failure of communication with the parent that could allow for disinherison. La. C.C. art. 1621(A)(8); Katherine Spaht, Successions and Donations, Developments in Business Law, 1981-85, 46 La. L.Rev. 707, 710-11 (1986).
The SCRA is a federal statute that provides general temporary relief to active duty military servicemembers from civil suit. 50 App. U.S.C.A. § 501, et seq. The purpose of the SCRA is (1) to provide for, strengthen, and expedite the national defense through protection extended by the SCRA to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation; and (2) to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service. 50 App. U.S.C.A. § 502. The period of a servicemember’s military service may *1274 not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the ser-vicemember or the servicemember’s heirs, executors, administrators, or assigns. 50 App. U.S.C.A. § 526(a).
The statute contains no exceptions and is drafted in extraordinarily broad terms, using the word “any” in different, and crucial, places. In re A.H. Robins Co., 996 F.2d 716, 718 (4th Cir.1993). The broad, unqualified, and mandatory language of section 526(a) leaves little room for judicial interpretation or oversight in its application; indeed, quite plainly, |17the tolling statute is unconditional. A.H. Robins Co., 996 F.2d at 718 (internal quotations omitted); see also Bickford v. U.S., 228 Ct.Cl. 321, 656 F.2d 636, 639 (1981). The only critical factor is military service; once that circumstance is shown, the period of limitations is automatically tolled for the duration of the service. Id.; see also Conroy v. Aniskoff, 507 U.S. 511, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993).
Courts across the country and in this state have reached different conclusions regarding the SCRA’s application in adoption cases and other cases regarding the legal relations between people. Ohio and Oklahoma have applied the SCRA to their statutes equivalent to La. Ch.C. art. 1245 to prevent their no-contact periods from running. See In re Adoption of W.C., n.k.a. W.B., 189 Ohio App.3d 386, 938 N.E.2d 1052 (Ohio App.3d 2010); See In the Matter of the Adoption of J.D.P., a Minor Child, 198 P.3d 905 (Okla.Civ.App.2008). However, New York declined to do the same because the SCRA only tolls the period for bringing an action in a tribunal. See Matter of Baby Girl, 206 A.D.2d 932, 615 N.Y.S.2d 800 (N.Y.App.Div.1994). The Louisiana Third Circuit declined to apply the SCRA to prevent an adoption without the consent of a military serviceman who failed to contact his child. The court determined the servicemember had ample opportunity to contact the child and the mother never tried to keep the child from the servicemember. See Kirby v. Albert T.J., 517 So.2d 974 (La.App. 3d Cir.1987), writ denied, 519 So.2d 107 (1987).
Furthermore, in Rebar v. Rebar, 165 Pa.Super. 341, 67 A.2d 598 (1949), the Pennsylvania Supreme Court declined to apply the former version of the |1SSCRA to a divorce where the husband argued his time in the military could not be included in determining whether he had deserted his wife. However, the court noted that principles of policy required that under certain circumstances, time in military service should be excluded. Id.
Finally, Louisiana courts have determined that periods of military service will not prevent a divorce decree for living separate and apart where the separation is independent of the military service. See Davis v. Watts, 208 La. 290, 23 So.2d 97 (1945); Pierce v. Gervais, 425 So.2d 922 (La.App. 4th Cir.1983); Gardner v. Gardner, 125. So.2d 463 (La.App. 2d Cir.1960). The application and effect of the SCRA regarding periods of time affecting legal relations is unclear.
The court, after hearing and after taking into consideration information from all sources concerning the intrafamily adoption, may enter a final decree of adoption, or it may deny the adoption. La. Ch.C. art. 1255(A). Upon a final decree of adoption, a parent, like Jon, is divested of all his legal rights with regard to the adopted child, thus severing the parent/child relationship. See La. Ch.C. art. 1256.
*1275 The basic consideration shall be the best interests of the child. Id. Because the trial court judge is in a better position to make the best-interests determination, this court will ordinarily not second-guess such sensitive decisions. Morris, supra. However, the trial judge’s discretion is not absolute, as the court’s decision is subject to reversal if found to be manifestly erroneous or clearly wrong. Id.
To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable; that is, |19much more probable than its nonexistence. In re Bourgeois, 04-1466 (La.App. 5th Cir.4/26/05), 902 So.2d 1104.
The considerations to be taken into account when determining whether adoption is in the child’s best interests have been explained by this court as follows:
In determining the best interest, the court needs to take into consideration that the legal consequences of adoption are abrupt, severe, and irrevocable: the relationship between the child and natural parent is severed. In making the determination, it is not enough to look at the love and home environment provided by the stepparent. The court should also consider the depth and closeness of the child’s ties with the non-custodial natural parent and the effect the loss of this relationship would have on the child. Children have a right to know and love their parents, and should not be denied this right except when the parent has proven himself unworthy of their love. Morris, supra, quoting In re Leitch, 32,021 (La.App.2d Cir.3/31/99), 732 So.2d 632, 635 (citations omitted).
From our review of the facts, we find most relevant the two-year period preceding Jeremy’s institution of this suit in June 2012. There were two broad and undisputed factors during that time that might be expected to impede the formation and development of the parent/child relationship. First, K.B. was three to five years of age during this time. She had only begun to comprehend the notion of Jon as a family member in the summer of 2010. As a three and four-year-old, her ability to receive and understand communications from Jon was within the control of Brianne and Jeremy. Second, while Jon’s military service did afford him leave and other occasions for communications with K.B., he was in the active duty military service, stationed in Connecticut, and for extended periods, serving on naval vessels. The combination of these factors meant that long-distance ^^communications would be required but also that adult facilitation by Brianne of such communications between K.B. and Jon was essential for the fostering of a relationship.
Within this setting, Jon argues that he did not communicate or visit with KB. immediately prior to this action because of “just cause.” We agree that just cause was established by the evidence.[7] The evidence concerning the events of the summer of 2010, and in particular, Jeremy and Jon’s exchange over Facebook in August of that year, reveal that Jeremy and Brianne effectively prevented any further *1276 development of Jon’s relationship with the child. Without any parental legal status over K.B., Jeremy indicated to Jon that he was required to be consulted over matters pertaining to K.B. Regardless of Jon’s objection, Brianne was not justified in ending Jon’s “wanna be father ideas” at that time. Such impediment to Jon’s actual visitation with the child might in many instances prompt judicial custody proceedings by Jon against Brianne. Nevertheless, any pursuit’ of such civil action was hampered by Jon’s status in the military and the difficulties of bringing such action, thus implicating at least the policy concerns of the SCRA.
While Jon was in the Shreveport area for two subsequent military leaves in the year preceding this suit, there was certainly no clear and convincing evidence that Brianne and Jeremy had ended their previously expressed hostility toward Jon’s direct involvement and communication with ijnKB. In fact, prior to the institution of the adoption action, Brianne and Jeremy continued to withhold any recognition of Jon’s rights as father, and they refused to begin any cultivation of KB.’s understanding of Jon.
Accordingly, the trial court’s failure to recognize Jon’s just cause defense in this matter was clearly wrong and manifestly erroneous. While we recognize that Jon’s military service made it difficult for him to institute a civil custody action to deal with the visitation barriers raised against him, we pretermit the question of the application SCRA. It suffices in this case that Jon’s military service amounts to an additional factor for our determination of just cause.

Conclusion

For the foregoing reasons, the judgment is reversed. Costs of this appeal are assessed to appellees, Jeremy L. Puckett and Alexis B. Puckett.
REVERSED.

. Jeremy and Brianne have split up several times during their marriage. Most of the separations were brief, usually amounting simply to cooling off periods. This separation, however, was a longer separation. One of the previous separations in 2009 had even resulted in an attempt by Brianne to obtain a protective order. During trial, Brianne stated that the allegations in the protective order were "exaggerations.”

. Jeremy took it upon himself in this time period to contact Jon through Brianne’s email address to tell him that he is generally quick to anger about things concerning Brianne and K.B. He expressed a desire to try allowing Jon to have some sort of a relationship with K.B. Brianne saw that this had occurred, and she told Jon in an email to ignore Jeremy. She told him that she was separated from Jeremy and that he did not seem to understand what that meant. She said the contacts being arranged between K.B. and Jon were "none of his business.”

. Brianne claimed at trial that during this shopping activity, Jon was acting distant and walking ahead of everyone.

. Jon raised the SCRA tolling statute to the trial court only in his motion for new trial. The trial court found that the SCRA did not toll the no-contact period.

. La. Ch.C. art. 1193 provides in pertinent part:
Unless rights have been terminated in accordance with Title X or XI, consent to the adoption of a child or relinquishment of parental rights shall be required of the following:
[[Image here]]
(4) The biological father of the child whose paternity has been determined by a judgment of filiation and who has established his parental rights in accordance with Chapter 10 of Title XI.

. We also note that "the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party,” La. C.C. art. 134(10), is an important consideration in the context of determining a child's best interest in the typical custody or visitation setting.

. While Jon’s claims of just cause may be viewed as an affirmative defense, a reading of Article 1245 reveals "just cause” as a part of the clear and convincing burden of proof placed on the stepparent/petitioner. This is more than the perplexing task of proving a negative. The facts within petitioner’s knowledge that suggest a lack of just cause should be proven, and in particular those facts demonstrating the stepparent’s and his custodial spousé's facilitation of the defendant’s communications and contact with the child.