51,110 (La.App. 2 Cir. 9/28/16)

**IN RE: B.J.C. APPLYING FOR INTRAFAMILY ADOPTION**

**No. 51,110-CA**

Court of Appeal of Louisiana, Second Circuit.

Judgment rendered September 28, 2016.

WEEMS, SCHIMPF, HAINES, LANDRY, SHEMWELL & MOORE By: Kenneth P. Haines, Counsel for Appellant, C.A.P.

SIMMONS, MORRIS & CARROLL, LLC By: CYNTHIA L. CARROLL-BRIDGES, Counsel for Appellee, B.J.C.

LAW OFFICE OF BRYCE J. DENNY By: Bryce J. Denny, Counsel for Appellee, R.L.P. and C.A.P., Jr.

Before WILLIAMS, MOORE and GARRETT, JJ.

WILLIAMS, J.

In this intrafamily adoption matter, the trial court terminated the parental rights of the biological father and granted a petition for intrafamily adoption filed by the stepfather of the two minor children. For the following reasons, we affirm.

## FACTS

B.C. ("the mother") and C.A.P. ("the biological father") began a romantic relationship when the mother was 16 years old and the biological father was 17 years old. Approximately one year into this relationship, they had their first child, R.L.P., who was born on December 22, 2007. Their second child, C.A.P., Jr., was born on August 13, 2010. The mother and the biological father were married on September 14, 2010.

Throughout the marriage, the couple was domiciled in the state of Texas. The biological father worked in the oil industry; the mother did not work outside the home. At some point during the marriage, both the mother and the biological father began experimenting with illegal drugs. The mother stopped using illegal drugs; however, the biological father became addicted to methamphetamines. The relationship deteriorated and the couple separated in De-

cember 2012. The mother filed for divorce and the petition for divorce was granted on April 16, 2013. In addition to the divorce, the mother obtained sole custody of the children, and the biological father was granted supervised visitation.[1]

Meanwhile, in February 2013, the mother began living in open concubinage with the petitioner, B.J.C. ("the stepfather"), in the state of Louisiana. They were married approximately one year later. Soon thereafter, on May 8, 2014, the stepfather filed a petition for intrafamily adoption, alleging, *inter alia*: the biological father had not provided financial support for the children in more than six months; the biological father had not visited or communicated with the children in more than six months; the children had been living with him (the stepfather) for at least six months prior to filing the petition; the biological father had forfeited his right to consent to the adoption; and it was in the best interests of the children that the petition for adoption be granted. More specifically, the stepfather alleged that the biological father was ordered to pay child support in the amount of $950 per month, effective April 19, 2013. According to the stepfather, the last full child support payment was made in May 2013, and a half payment was made in September of the same year. The stepfather also alleged that the biological father had been "in and out of jail" in Caddo and Bossier parishes for various offenses, including a myriad of drug charges, simple burglary and theft of a motor vehicle.

The biological father was incarcerated when the petition for adoption was filed, and counsel was not appointed to repre-

---

1. The biological father takes issue with the manner in which the mother gained sole custody of the children, and he has mentioned the issue throughout his brief and during his oral argument before this Court. However, the judgment was issued in 2013 in the state of Texas and is a final judgment. Therefore, the argument with regard to the issue of sole custody/supervised visitation will not be reviewed by this Court.

sent him. On May 23, 2014, he filed a *pro se* response to the petition, alleging that the mother had denied him access to the children and had refused to allow him to visit them.

On October 2, 2014, the trial court signed a judgment terminating the parental rights of the biological father and granting a final decree of adoption. The biological father appealed the judgment. This Court vacated the judgment, finding as follows: (1) the trial court erred in failing to inquire |₃into and make a determination of whether the biological father's due process rights necessitated the appointment of legal counsel; and (2) this matter should not have proceeded without the biological father's attendance at the hearing to allow him the opportunity to rebut any evidence that his consent was unnecessary for the adoption. *In re B.J.C.*, 49,852 (La.App. 2 Cir. 4/15/15), 163 So.3d 905. We remanded this case to the trial court for further proceedings.

On remand, a trial was conducted on two separate days, December 3, 2015, and February 4, 2016. The biological father was present during the hearing and he had obtained counsel.

During the trial, the biological father testified as follows: he began working in the oil industry when he was 18 years old; during his marriage to the mother, he financially supported her and various members of her family; he never had any problems financially supporting his children until he became addicted to illegal drugs; he began experimenting with illegal drugs when he began staying away from home for long periods of time while working in the oil industry; his drug addiction worsened over time; the mother often threatened to leave him if he did not stop using illegal drugs; he would promise the mother that he would try to stop his drug use, but he never did so; the mother

moved out of the house in late 2012 because they "grew apart" and "my drug problem was getting worse"; he initially sought joint custody of the children; he later learned that the mother had obtained sole custody and he had been awarded supervised visitation; initially, the mother allowed him to have unsupervised visits with the children; in May or June 2013, he and the mother agreed that it was "not good" for him to be around the children because of his continued illegal drug use; the mother |₄offered to allow him supervised visits "every now and then"; he would talk to the children on the telephone, but the mother did not want him to be around the children when he was under the influence of illegal drugs; during their marriage, he and the mother allowed the children's paternal grandmother to babysit the children, even though she (the grandmother) was addicted to methamphetamines; after the divorce, the mother allowed him to have unsupervised visits with the children, as long as he did not leave them alone with his mother; in June 2013, he and his mother were on their way to a family function when he allowed the children to ride in the vehicle with his mother; when the mother learned that he had allowed the children to spend time alone with his mother, she informed him that all further visits with the children would be supervised pursuant to the court order; after that incident, the mother refused to allow him unsupervised visits with the children because "in her mind *** I was still messed up and I was still attempting to get clean"; he has not seen the children since June 2013; the mother attempted to arrange some supervised visits between him and the children, but those visits never took place; the mother and the stepfather invited him to join them and the children for a vacation, which they paid for; he did not go with the family for the vacation because he did not have any mon-

ey; he initially paid child support but became unable to do so because he was unemployed; he lost one job in June 2013 due to a downturn in the oil industry; he lost other jobs due to failed drug tests and/or his inability to perform his job duties because of his illegal drug use; he did not attempt to see his children during this time because "I didn't want them to see me like that"; the mother denied him visitation with the children "on several occasions," specifically the younger child's birthday in August 2013; he does not recall receiving any text messages from the mother to arrange supervised visits; he turned to criminal activity to support his drug habit; he was not the type of father he should have been; he was arrested in February 2014 because he stole a dirt bike (motor vehicle) with the intent to "sell it for money," and he broke into a vehicle and stole items to sell; he did not have the opportunity to consume any illegal drugs or alcohol during his incarceration; after he went to jail, he would call the mother and ask to speak to the children; although the mother refused to allow him to talk to the children, she would provide him with updates about them; he did not want to have to explain to the children that he was in jail or why he was there; he did not pay child support or buy gifts for the children because he was unemployed; and the stepfather had been financially supporting children since "May or June" of 2013.

The biological father denied ever engaging in any sexual conduct with the mother's 15-year-old sister.[2] He also denied inviting another 15-year-old girl to be his "bedroom buddy." The biological father admitted that the message to the girl was sent from his Facebook account; however, he testified that the message was sent to the girl by his younger brother. Further, he admitted that he had consumed illegal drugs with the mother's teenage sister; however, he insisted that he did not have any type of sexual relationship with her.

The biological father's testimony with regard to his failure to communicate with the children was ambiguous. First, he testified that in May or June 2013, he told the mother that he was "getting a drug problem, and we kinda [sic] come to the conclusion that that's not good to come around the kids because of where I was at [sic]." He stated that at that point, the mother offered to allow him supervised visits with the children "every now and then," and he began to communicate with the children by telephone. Thereafter, he testified that the mother denied him visitation with the children on "several" occasions, specifically the younger child's birthday in 2013. The biological father also testified that he did not file any pleadings in court to hold the mother in contempt for refusing to allow him access to the children because he was addicted to illegal drugs and he "knew it wasn't going to work out for good in my favor[.]" Further, the biological father stated that he did not attempt to communicate or visit with the children in late 2013 because his drug habit had worsened and he "didn't want them to see me like that." He also testified that he did not want to talk to the children on the telephone while he was incarcerated because he did not want to have to explain his whereabouts to them. Thereafter, he testified that the mother would not allow him to speak to the children while he was incarcerated. He also testified that he wrote letters to the children during his

---

**2.** In the Texas court proceedings, the mother testified that she wanted sole custody of the children because she had learned that the biological father had engaged in a sexual relationship with her then-15-year-old sister. She also testified that she had discovered that he had also solicited sexual acts from another 15-year-old girl.

incarceration; however, the mother would not show the letters to the children.

The stepfather testified as follows: he has provided financial support for the children since February 2013, when they moved into his home; his wife is a stay-at-home mother; the children last saw their biological father in May 2013; the unsupervised visits between the children and the biological father were terminated because the biological father breached his agreement not to leave the children alone with his mother; the biological father's mother was addicted to illegal drugs; he (the stepfather) and the mother unsuccessfully attempted to arrange some supervised visits between the biological father and the children after May 2013; the biological father did not show up for any of the prearranged supervised visits; and the biological father did not begin to write letters to the children until after the petition for adoption was filed.

On cross-examination, the stepfather admitted that he and the mother met when they were married to their former spouses, and they began living together before their divorces were finalized. He also testified that after the mother obtained the supervised visitation order from the Texas court, she allowed the biological father to exercise unsupervised visits with the children. He stated that due to the strained relationship between the mother and the biological father, he and the biological father worked together to facilitate visits with the children. He stated that the unsupervised visits became problematic for various reasons.[3] The stepfather also testified that when the children first began referring to him as "daddy," he and his wife would correct them. However, eventually, after the biological father became incarcerated, they began to allow the children "to start calling me whatever they wanted to and they both started calling me 'daddy.'" According to the stepfather, he and his wife began losing contact with the biological father "around August" 2013.

During the hearing, the mother testified as follows: she and the biological father separated in December 2012, due to the illegal drug use of the biological father, his mother and his brother, who were both living with them at the time; she decided to seek sole custody of the children because she discovered that the biological father had "slept with" her 15-year-old sister and that he had "attempted sleeping with another fourteen or fifteen year old" girl; she knew that the biological father continued to use illegal drugs after the separation; after she was granted sole custody of the children, she allowed the biological father to have unsupervised, sometimes overnight, visits until "things started happening that made me change my mind about that";[4] she terminated the unsupervised visits because the biological father disregarded her wishes that the children not be left alone with his mother; she had never refused the biological father contact with the children; she had attempted to

---

3. The stepfather testified that following one unsupervised visit in the spring of 2013, the older child, who was five years old, told her mother that she and her younger brother stayed at a motel with the biological father and his mother. The child reported that she was locked out of the bathroom of the motel room because the biological father and his mother were in the bathroom and would not allow her to come inside. Approximately one month later, the biological father left the children alone with his mother after telling the children's mother that he would not do so.

4. The mother testified that following one weekend visit with the biological father, the children returned home "very, very tired." She stated that her then-five-year-old daughter told her that they had been riding around in the biological father's truck "all night and went from this place to the next."

facilitate supervised visits between the biological father and the children; the biological father never exercised his right to supervised visits; she attempted to facilitate visitation with the biological father on the younger child's birthday in August 2013, but she requested that the biological father refrain from inviting "people who were involved in drugs"; the biological father "didn't want what I was offering" and the visit never took place; the biological father began paying support in February 2013; she has not received any child support payments from the biological father since September 2013; the stepfather has financially provided for the children since September 2013; the biological father called her from jail after he became incarcerated; she accepted the phone calls and provided him with information about the children; the biological father did not want the children to ask him where he was located because he did not want to have to "explain that to them"; and the biological father did not send letters to the children until after the petition for adoption was filed and the first appeal was pending.

On cross-examination, the mother testified as follows: she did not work during her relationship with the biological father; she discovered the biological father "had tried" illegal drugs before they were married, but she did not know he "had a problem"; the biological father provided the sole financial support for her, their children and her younger brother throughout their relationship; the biological father was present for the birth of both children; after the birth of the second child, she and the biological father decided that he would have a vasectomy because that procedure "was easier" than a tubal ligation; she understands that the two children are the only children that the biological father will have; she initially sought joint custody of the children; while the divorce was pending, she discovered more details about the biological father's "drug issues" and learned that he had been "sleeping with underage, younger children"; she did not notify the Texas court when the biological father stopped paying child support; she did not allow the biological father to go six months without paying child support in an effort to allow the stepfather to adopt the children; she asked the biological father to allow the stepfather to adopt the children before she married the stepfather because the biological father "wasn't being the best dad for them"; the biological father seemingly agreed to consent to the adoption in exchange for the stepfather's agreement to "pay off" his truck and the mother's agreement to "get fixed" so that she would not have any more children; she did not seek to file criminal charges against the biological father with regard to the allegation of sexual incidents between him and her underage sister; she allowed the biological father to have unsupervised visits with the children until she "saw things that he was doing to put my children in harm's way"; she received several letters, addressed to the children, from the biological father in 2015, during his incarceration; she did not show the letters to the children because she did not know how to explain who their biological father was to them; her daughter remembers the biological father but she has "bad memories of him"; and after the unsupervised visits with the biological father in 2013, the daughter would cry and beg her "to not make her go back."

Various witnesses testified on behalf of the stepfather, including Amberlie Rupert, the biological father's former girlfriend, and Albert Lee Flowers, Jr., the mother's grandfather. Rupert testified that she and the biological father were together "every day" during the summer of 2013, and she never saw him with the children. She also testified that, to her knowledge, the moth-

er had never denied the biological father the right to visit with the children.

Flowers testified as follows: the mother and the children came to live with him and his wife after the mother and the biological father separated; the couple separated because the biological father was using illegal drugs and the mother wanted to get away from him; to his knowledge, the mother never denied the biological father access to the children; the mother allowed the biological father to see the children when she and the children lived with him (Flowers); the biological father's illegal drug use was common knowledge to the family; he has witnessed the stepfather's interaction with the children and "they get along great"; and he believed the adoption is in the best interests of the children.

On cross-examination, Flowers testified that he had not observed the biological father interacting with the children. However, he stated that the older child was afraid of the biological father. Flowers also testified that, in the past, he and the biological father had a "good" relationship and they had often gone fishing together.

Several witnesses testified on behalf of the biological father, including his mother, maternal grandmother, maternal aunt and cousin. They admitted that the biological father was addicted to illegal drugs. However, they described him as a loving father who financially supported his children and various members of his family and the mother's family before he became addicted to illegal drugs. Further, they testified that the entire family would be adversely affected if the biological father's parental rights were terminated and the stepfather were allowed to adopt the children. The witnesses also testified that the adoption would cause the children to be "cut off" from a very loving and close-knit family.

Following the testimony of the stepfather's witnesses, the biological father moved for involuntary dismissal of the petition for adoption. He argued that the stepfather failed to meet his burden of proving that the biological father failed to communicate with the children and failed to provide financial support for at least six months without good cause. More specifically, the biological father asserted that he "fell behind" on child support payments because he lost his job. He also maintained that the mother did not seek payment of arrearages. The trial court denied the motion.

As stated above, a trial was conducted on December 3, 2015, and February 4, 2016. Between these two dates, the trial court appointed a social worker, Marsha McCall, to conduct an inquiry with regard to the best interests of the children. After interviewing the mother, the biological father, the stepfather, and the children, McCall concluded that the intrafamily adoption was in the children's best interests. The trial court granted the petition for intrafamily adoption and ordered that the biological father's parental rights be terminated. In its reasons for judgment, the court stated:

> [T]he evidence has shown that the biological father has had no contact with the children nor has he provided any financial support for a period of at least six (6) months prior to the filing of the Petition for Intrafamily Adoption. These requisites having been established, [the biological father] has therefore forfeited his right to consent to this adoption. Having met this requirement, the Court must consider whether the adoption is in the best interests of the minor children. In this Court's judgment, there can be no other finding other than that the law and evidence establish conclusively that the adoption is in the children's best interest. ***

The biological father now appeals.

## DISCUSSION

■ The biological father contends the trial court erred in granting the petition for intrafamily adoption. He argues that the stepfather failed to comply with the provisions set forth in LSA–Ch.C. art. 1243.[5] More $|_{13}$specifically, he argues that the stepfather did not have "legal custody" of the children for at least six months prior to filing the petition for adoption because he had only been married to the mother for 24 days when the petition was filed. The biological father also argues that the children were born to the mother and the biological father prior to their marriage. Therefore, pursuant to LSA–Ch.C. art. 1244(C), the mother was required to join in the petition.[6]

In the previous appeal of this case, *In re B.J.C.*, *supra*, this Court specifically found that the stepfather had complied with the provisions set forth in LSA–Ch.C. art. 1243. We also found that the mother was not required to join in the petition, as she had consented to the adoption by executing an authentic act. *Id.* at 909. The biological father did not seek rehearing with this Court or a writ of certiorari with the Louisiana Supreme Court with regard to these issues.

■ $|_{14}$Pursuant to the law of the case doctrine, the prior decision of this Court with regard to those issues is final. Those issues will not be readdressed by this Court.[7]

■ The biological father also contends the stepfather failed to introduce clear and convincing evidence that he (the biological father) failed to support or visit the children, without just cause, for more than six months. The biological father concedes that he has not paid any child support since September 2013. However, he asserts that he began paying child support more than two months before the court ordered him to do so. Therefore, according to the biological father, he had not gone six

5. LSA–Ch.C. art. 1243(A) provides, in pertinent part:

A stepparent ... may petition to adopt a child if all of the following elements are met:
(1) The petitioner is related to the child by blood, adoption, or affinity through the mother of the child or through a father who is filiated to the child in accordance with the Civil Code.
(2) The petitioner is a single person over the age of eighteen or a married person whose spouse is a joint petitioner.
(3) The petitioner has had legal or physical custody of the child for at least six months prior to filing the petition for adoption.

6. LSA–Ch.C. art. 1244(B) and (C) provide:

B. If the parent of a child born of marriage to the stepparent petitioner and executes an authentic act of consent, he need not join in the petition nor be served with a copy thereof.
C. The parent of a child born outside of marriage who is married to the petitioning spouse shall join in the petition.

7. The law of the case refers to a policy by which the court will not reconsider prior rulings in the same case. *Arceneaux v. Amstar Corp.*, 2010–2329 (La. 7/1/11), 66 So.3d 438; *J–W Operating Co. v. Olsen*, 49,925 (La.App. 2 Cir. 6/24/15), 167 So.3d 1123. The law of the case principle relates to (a) the binding force of trial court rulings during later stages of the trial, (b) the conclusive effects of appellate rulings at trial on remand and (c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal. *Id.* Some reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both sides, of affording a single opportunity for the argument and decision of the matter at issue. *Id.* However, even when applicable, the law of the case is discretionary and should not be applied where the error is palpable and the application would result in injustice. *Id.*

months without supporting his children because he "prepaid 2½ months."

Intrafamily adoptions are authorized by LSA–Ch.C. arts. 1170 and 1243, when the adoption petition is filed by the stepparent and spouse of a custodial parent of the children. As a general rule, the consent of the biological father is required for an intrafamily adoption by the stepfather. *See* LSA–Ch.C. art. 1193. However, consent of the parent may be dispensed with when the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exists: (1) the other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months; or (2) the other parent has refused or failed to visit, communicate, or attempt to communicate with the children for a period of at least six months. LSA–Ch.C. art. 1245(C).

The party petitioning the court for adoption carries the burden of proving a parent's consent is not required under the law. *In re B.L.M.*, 2013–0448 (La.App. 1 Cir. 11/1/13), 136 So.3d 5; *In re J.A.B.*, 2004–1160 (La.App. 1 Cir. 9/17/04), 884 So.2d 678, *writ denied*, 2004–2963 (La. 12/14/04), 888 So.2d 848. Once a prima facie case is proven, the burden of proof shifts to the nonconsenting parent to show that his failure to visit the children or to comply with the child support order was due to factors beyond his control. *In re D.D.D.*, 2006–2274 (La.App. 1 Cir. 5/4/07), 961 So.2d 1216; *In re T.A.S.*, 2004–1612 (La.App. 1 Cir. 10/29/04), 897 So.2d 136. See also *In re Puckett*, 49,046 (La.App. 2 Cir. 4/17/14), 137 So.3d 1264; *In re Morris*, 39,523 (La.App. 2 Cir. 1/26/05), 892 So.2d 739 (to find "just cause," a parent's failure to comply with an order of support, visit or communicate with his children must be due to factors beyond his control).

On April 16, 2013, the 71st Judicial District Court in Harrison County, Texas ordered the biological father to pay to the mother child support payments in the amount of $438.46 twice monthly. The evidence of record reveals that the last full child support payment was made on September 16, 2013, and a partial payment was made on September 27, 2013. The biological father attributes his failure to maintain child support payments to his incarceration. However, by his own admission, the biological father did not become incarcerated until February 2014, more than five months after he stopped making support payments. The biological father also blames his failure to pay support on his unemployment. Yet, he admitted that he was unable to maintain employment because of his drug addiction.

The record reflects that the biological father was able to gain employment. However, his inability to maintain employment does not constitute just cause unless the inability was due to a factor beyond his control. It is undisputed that the biological father became addicted to methamphetamines. Rather than seeking a treatment plan to attempt to overcome his addiction, he chose to resort to a life of crime to support—not his children—but his drug addiction. The record amply demonstrates that the biological father's failure/refusal to refrain from using illegal drugs, prior to his incarceration, prevented him from maintaining gainful employment. In turn, he was unable to support his children as ordered by the court. This failure to provide financial support for the children was not a factor beyond the biological father's control. Consequently, we find that the trial court did not err in concluding that the biological father failed to meet his burden of proving that he had just cause

for the nonpayment of child support for a period of at least six months. Accordingly, the biological father's consent to the adoption was unnecessary.

▊ Moreover, the biological father testified that the mother thwarted his attempts to visit and/or communicate with the children. However, the testimony revealed that, before the father's addiction to illegal drugs increasingly worsened, the mother allowed him unsupervised, often overnight, visits with the children. The biological father testified that he stopped communicating with the children in mid-2013 because he was "getting a drug problem and [he and the mother] kinda come [sic] to the conclusion that that's not good to come around the kids because of where I was at [sic]." He also stated that he did not attempt to visit the children because his "drug addiction was bad" and he "didn't want them to see [him] like that." Even after the biological father became incarcerated in February 2014, the record shows that he did not attempt to write letters to the children until after the stepfather filed the petition for intrafamily adoption. Therefore, we find no error in the trial court's conclusion that the biological father did not meet his burden of proving that he had just cause for his failure to communicate with the children for a period of at least six months, and his consent to the adoption was not necessary.

Our finding that the biological father's consent was unnecessary because of his failure to provide support and visit or communicate with the children does not end our analysis. We must now determine whether the adoption is in the best interests of the children.

▊ Even if consent of a biological parent is not necessary because of the failure to support or communicate with the children, the court must still consider whether the adoption is in the best interests of the

children. The basic consideration in an intrafamily adoption is the best interests of the child. LSA–Ch.C. art. 1255; *In re C.B., Applying for Adoption*, 94–0755 (La. 10/17/94), 643 So.2d 1251; *Anderson v. Ramer*, 27,469 (La.App. 2 Cir. 9/27/95), 661 So.2d 584. In cases where the stepparent seeking adoption is married to the parent who has been granted sole custody of the children, there is a rebuttable presumption that the adoption is in the best interests of the children. LSA–Ch.C. art. 1255(C); *In re D.D.D., supra; In re T.A.S., supra.*

Herein, the biological father argues that McCall failed to consider the biological father's right to have a relationship with his children and how the loss of that relationship would affect the children. He also argues that McCall conducted a "flawed assessment" and based her conclusions on "unproven facts."

Our review of the record reveals that McCall was accepted by the court as an expert in the field of social work. She testified unequivocally that the adoption of the children by the stepfather was in the best interests of the children. More specifically, she testified as follows:

I interviewed all the parties involved, all the adults: the mother, stepfather, biological father. I talked to the children. I looked at the time frames and saw who did what for the children. I went from there and made an assessment that two years had lapsed since these children had a substantial relationship with their [biological] father, which was one year prior to him being in jail.

\*\*\*

I personally do not believe that it is fair to make these children continue to wait to go on with their lives. They have waited long enough. It's been two years since they visited. One of those years, [the biological father] was not incarcer-

ated and by his own admission, *** he admitted that he did not visit with the children because of his drug use. Then he was incarcerated, giving it another year. They've waited long enough.

***

It's not fair to make a child have to wait while he proves himself. His choices were his. *** They were his choices and he knows what those choices were. And his choices took him away from those children for two years. That's all I can see.

***

If these children were older, I'll be honest with you, I'd be giving you a different opinion. Okay? But they're young children and they've already put their [lives] on hold for two years and adjusted to a new way of life. And adjusted to a new person that they consider to be their father. Is it fair for them to have to wait another year while he goes through drug rehabilitation? Do we see if it's going to go past two months [of being drug-free]? No. *** I have no way of saying that he is going to make it. That he's going to stay rehabilitated. *** Everybody rehabilitates in jail. *** [T]he track record on methamphetamine use and addiction is known. You know, he has to come out of jail. He would have to prove himself to be straight, prove himself to be rehabilitated. Not just straight, but rehabilitated for a long period of time. Is that fair to make small children wait that long? I don't think so.

***

McCall further testified that it would not be in the best interest of either child to reintroduce the biological father into their lives. She stated that the younger child did not have any recollection of the biological father, and the stepfather is the only "father" that child has known. She opined that, at this point, it would be "very detrimental" to reintroduce the biological father into the younger child's life. With regard to the older child, McCall testified that the child became "very upset" when she was questioned about the biological father. According to McCall, the child became "tearful" and stated that she would "run away" if she were forced to visit the biological father.[8] McCall stated, "I think it would be in [the older child's] best interest not to have to be concerned about whether or not [the biological father] is going to get back on meth, because he has not proven himself to be stable yet."

After reviewing the record in its entirety, we find that the trial court did not err in finding that the adoption is in the best interests of the children. The testimony established that the stepfather has provided the children with love, support and a stable home environment. The witnesses testified that the stepfather has always treated the children as if they were his own. The evidence also established that the children have lived with him for more than three years (the majority of their young lives), and that he has endeavored to build a strong relationship with them. Additionally, the record establishes that the children experience love, stability and security in the home. McCall testified that both children conveyed their love for their stepfather.

Conversely, the record shows that the children no longer have a meaningful bond with the biological father. At this point in their lives, they have not seen or communi-

---

8. McCall testified that the older child relayed memories of the biological father being violent toward the mother. The biological father testified that the older child may have been afraid of him because he was "kind of hard" on her. He also stated that he considers himself a "strict dad."

cated with him in more than three years. By the biological father's own admission, he stopped visiting with the children in mid-2013 because he was addicted to illegal drugs and he did not want the children to see him in that state. We find that the court did not err in finding that the adoption of the children by the stepfather is in the best interests of the children.

## CONCLUSION

For the reasons set forth herein, we affirm the judgment of the trial court granting the petition for intrafamily adoption and terminating the parental rights of the biological father. Costs of the appeal are assessed to C.A.P., the biological father.

AFFIRMED.