Judgment rendered July 14, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,052-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

IN RE:  R.A.L. APPLYING FOR
INTRAFAMILY ADOPTION OF
K.B.T.M. AND L.C.M.

* * * * *

Appealed from the
Caddo Parish Juvenile Court
Parish of Caddo, Louisiana
Trial Court No. 613630

Honorable Ree Casey-Jones, Judge

* * * * *

MARK J. MICIOTTO                          Counsel for Appellant,
                                          R.A.L.


K.B.M., JR.                               Appellee, In Proper
                                          Person



* * * * *

Before GARRETT, THOMPSON, and HUNTER, JJ.

**GARRETT, J.**

The appellant, RAL ("the stepfather"), appeals from a decision by the Caddo Parish Juvenile Court denying his request for an intrafamily adoption of KBTM ("TM") and LCM ("LM"), and his motion for a new trial.[1] For the following reasons, we affirm the juvenile court judgment.

**FACTS**

KJL ("the mother") and KBM ("the father") were married on January 16, 2011, and had two children, TM, born January 26, 2011, and LM, born June 25, 2013. The parents separated in July 2015, and the mother filed for divorce in August 2015. At that time, the father was employed in the oilfield and worked two weeks on and two weeks off. On November 16, 2015, an interim order of child support was entered, requiring the father to pay $1,200 per month in child support. In April 2016, another interim order was entered naming the mother as the primary custodial parent, and setting visitation for the father. In July 2016, a final judgment on custody and support was entered, awarding the parents joint custody of the children, naming the mother as the domiciliary parent, setting visitation for the father, finding the father to be $7,300 in arrears in child support, and lowering the monthly child support obligation to $1,000. Their judgment of divorce was entered on April 19, 2017. On April 24, 2017, the father filed for Chapter 13 bankruptcy in Texas.

The last date the father visited with the children was October 16, 2016. The mother claimed he moved to Texas, stopped seeing the children, and stopped paying child support. She maintained that she did not know

---

[1] Pursuant to URCA 5-1 and 5-2, the initials of the parties involved will be used to protect the minors' identities.

where the father was for a period of time. The mother met the stepfather in August 2016, and they were married on July 15, 2017. They have since had a child of their own.

On January 8, 2019, the stepfather filed a petition for intrafamily adoption, stating that he wanted to adopt TM and LM. He asserted that the consent of the father to the adoption was not required, pursuant to La. Ch. C. art. 1245, because he failed to visit, communicate, or attempt to communicate with the children, without just cause, for more than two years. The petition alleged that the failure to exercise visitation rights occurred "despite the fact that [the mother] has encouraged same." The petition also alleged that the father failed to make child support payments without just cause. The mother filed an authentic act of consent to the adoption.

On May 15, 2019, the father filed an opposition to the intrafamily adoption. He claimed that the mother purposefully and intentionally interfered with his visitation with the children. On May 31, 2019, the father filed a motion to appoint a mental health evaluator. On July 31, 2019, the juvenile court appointed Sandi Davis to conduct the mental health evaluation.

This matter was heard in the juvenile court on two dates, May 31, 2019, and June 8, 2020. The interruptions caused by the COVID-19 pandemic partially contributed to the gap between the hearing dates. The parties stipulated that there was a period of time in excess of six months when the father did not pay child support or visit with the children.

Text messages between the father and mother were admitted into evidence and show that, early in 2016, the relationship between the parents was extremely contentious. The mother began limiting and denying

2

visitation to the father. On several occasions, the mother did not respond to the father's text messages. In one message, the father claimed the mother refused to allow him to talk to the children at Christmas. On March 4, 2016, in a series of text messages, the mother informed the father that TM had a T-ball scrimmage on a Sunday afternoon during the father's visitation. The father replied that they had plans for the weekend and asked the mother to "Leave us alone and let me enjoy my children." Beginning on March 6, 2016, the father sent the mother text messages indicating he would pick the children up for the Easter weekend, and he asked to have the children during spring break, from March 28 until April 4. That was the week following Easter. He noted "that's in my designated time window you created." On March 14, 2016, the father texted the mother again and said, "I need to know now if you plan on giving me trouble with Easter weekend and spring break." He said he had plans to make. The mother replied that she had Easter plans to make as well. Later text messages reflect that the mother was not making the necessary arrangements for the father to pick the children up for their visitation. On March 22, 2016, the mother sent a text message informing the father that he could not pick up the children if he refused to let her have them for half the day on Easter. In another text message, the mother demanded that the children be returned in order to have Easter with her family. On November 28, 2016, the father sent the mother an email asking her to tell the children that he loved them and cared for them. The mother denied receiving this email.

At the hearing, the father testified that he last saw the children in October 2016. About that time, the mother told him he was not in the right state of mind to exercise visitation. In November 2016, he emailed the

3

mother and asked to take the children to his mother's house in Alabama for Christmas. She refused to let them go because she wanted the children to be with her family. The father did not file suit to enforce his visitation rights because he could not afford it. He stated that he tried to participate with the children, but he butted heads with the mother and she wanted more separation.

The father testified that he was laid off from his oilfield job in January 2016 due to market conditions. He later moved to White Oak, Texas, in October 2016, and eventually entered into a common-law marriage. He worked for Home Depot and Lowe's, earning approximately $20,000 per year. In August 2018, he opened his own construction business; he takes $500 every two weeks from the new business. The father admitted that he did not pay all the child support that was due, but he did pay some. The last time he paid child support was in October 2016. When the father filed for bankruptcy in April 2017, he listed the mother as a creditor based upon the child support arrearage. She was served with information about enforcing the claim in the bankruptcy, but failed to do so. At the time of the court hearings, the bankruptcy was still ongoing.

The children's paternal grandfather and step-grandmother (hereinafter "the paternal grandparents") live in Natchitoches, Louisiana, and had a good relationship with the mother prior to this litigation. After his move to Texas, the father was estranged from his father and stepmother for a time because his father cosigned a note for a truck that was repossessed. In 2018, they reconciled. According to the father, the paternal grandparents were allowed to see the children. The mother would not allow the father to be present at their house when the children were there. The father said he knew every

4

time his children went to his father's house, and he kept up with the children through other people's Facebook pages because he was blocked from the mother's page.  At the time of the hearing, the father had filed a motion in the First Judicial District Court to enforce his visitation rights.  He stated that he would like to work with the mother and stepfather to re-enter his children's lives.

At the hearing, the mother was shown copies of text messages and an email between her and the father.  She denied interfering with the father's visitation rights and claimed she did not know where he was until she received the bankruptcy papers.  Her divorce attorney advised her not to try to recover the child support arrearage in the bankruptcy proceedings.  She had consistent contact with the paternal grandparents and allowed the children to visit in their home.  The mother also allowed the father's mother, who lives in Alabama, to have contact with the children.  The mother acknowledged having a discussion with the step-grandmother about allowing the father to see the kids.  The mother stated that the stepmother "knew it was not her place to do that."

The mother was asked when she decided that the father should not be a part of the children's lives.  She said, "That was really tough."  In early 2017, she decided that she did not want the father to see the children anymore.  After three months of no communication, she and the stepfather decided that they should "move on with their lives."  This was before she married the stepfather.  She acknowledged that the father contacted her in November 2016, and wanted to take the children to Alabama for Christmas.  She would not allow it.  She said he did not have a right to take "my kids" at Christmas and to "take that away from me."  She said, "I feel like they

should be with their mom and whatnot on Christmas as well, not in a whole other state." She admitted that, after 2016, she did not reach out to the father about visitation.

In September 2018, a member of the father's family was getting married and the mother planned to attend, with the children, until she found out that the father would be there. She and the children did not attend the wedding.

AM, the step-grandmother, testified that the marriage between the father and the mother did not work from "day one" and that, because the father was not allowed to see the children, he felt defeated. After the separation, AM and her husband, KM, saw the children about once a month and the children would often visit in their home. However, since the petition for intrafamily adoption was filed, they had not been allowed to see the children as often and were told that they would have to visit the children at the mother's home in Shreveport. AM stated that they used to attend the children's ballgames and other activities, but lately had not been given a schedule of events. AM corroborated that the mother and the children did not attend a family wedding in September 2018 because the mother did not want the children to see their father. The mother also failed to attend another family wedding in October 2017, for the same reason. In 2018, the mother refused to allow AM and KM to take the children to the beach because she did not know who would be there. The mother said that she wanted the children's first beach experience to be with her, even though they had been to Galveston while their parents were still married.

AM said the children were at her house at Christmas 2018 and questioned why she and KM did not come to a school activity. They had not

6

been aware of the program, but the children said their mother told them the grandparents did not come because they were busy. The father tried to Facetime with the children that Christmas, but AM did not answer the call because she knew it would be against the mother's wishes. AM talked with the mother about the father trying to see the children and the mother's response was, "What about [the stepfather's] feelings." AM replied that she was only concerned about the children. AM said she did not have a picture of the father in her house to keep the children from asking their mother questions about where their father was, which might have caused the mother to stop allowing the grandparents to see the children. AM said that since the mother became aware that AM and KM see the father, the mother has limited their time with the children.

The next portion of the hearing was held on June 8, 2020. The attorneys informed the court that proceedings in the First Judicial District Court to enforce visitation and child support obligations had been stayed pending the outcome of this motion for intrafamily adoption.

The stepfather testified that he had been providing for the children financially, including paying for their health insurance. He began supporting the children in October 2016, when the mother lost her job. He was involved in everything that the children did. They participated in baseball and BMX bicycle riding. He said, "They love me 100 percent and I stepped in when I needed to and I had to." He stated that he loved "these boys to death and I will be there for them no matter what." The stepfather testified that, if the adoption was not granted, he would still be involved in the children's lives. The stepfather had never met the children's father. The stepfather denied ever saying that the father should be excluded from the

7

children's lives. He said he and the mother decided that they should "move on." He denied ever telling the paternal grandparents not to let the father see the children. He said he and the mother asked to be notified so they could prepare the children. However, he admitted that they stopped allowing the children to go to their grandparents' house because the father might be present.

Sandi Davis, the owner of Family Counseling Center, was appointed by the court to conduct a mental health evaluation on the parties and the children. She met with the father, mother, stepfather, father's common-law wife, paternal grandfather, step-grandmother, and the children. The older child was almost nine and the younger child was six. The principal question she addressed was whether there was interference with the father's visitation by the mother. Her report was filed into evidence. Davis recited circumstances indicating that the mother did, in fact, know where the father was in Texas. The mother got information from the father's parents in order for a curator to contact the father to finalize the divorce. Five days after the divorce was finalized, the mother received a letter from the father's bankruptcy attorney with an address for the father.

In the report, regarding the payment of child support, Davis stated the father told her that he sent the mother three checks for $1,000, but she never cashed them. He was aware that the child support obligation was suspended pending the outcome of the present case. The father said he gave the mother a check for $1,000 at the hearing in May 2019. The mother told Davis that, because the check was written on the account of the father's new wife, she didn't cash it and ripped it up. Davis found it interesting that the stepfather told a different story regarding the check. He claimed that the mother

8

accepted the check, but then lost it. Davis noted another discrepancy in the stepfather's statements to her. He said the paternal grandmother was coming to town and he had never met her. The father said they had met and there was a picture of his mother with the stepfather.

Davis noted in her report that the mother testified, in May 2019, that she would have allowed the father to have visitation with the children. However, the mother also said that, after the father had been gone for three months, she and the stepfather decided to "move on." The children started calling the stepfather "Daddy" in February 2017, only a few months after the father's last visit. Davis stated that, even though the petition for intrafamily adoption asserts that the mother encouraged contact between the father and the children, the mother admitted in court that she did not encourage contact after 2016. Davis noted the numerous text messages in 2016 in which the father sought visitation and the mother deemed the messages to be harassment.

Davis expressed concerns in her report about how quickly the mother dismissed the importance of the children knowing and having some sort of relationship with their father. She thought that omitting and avoiding communication about the biological father hindered the relationship to some degree. She said, "It's difficult to wrap my brain around the idea that after only three months with no contact, the mother and stepfather made the decision that the father should no longer be in the children's lives and the stepfather would be 'Daddy.'"

In the report, Davis stated that the father and mother both made mistakes in how this matter was handled. She noted that the father did not take the initiative the way he should have to be more active in the children's

lives, but, at the time of the hearing, he had apparently made significant changes in his life and would like to improve his relationship with his children.

Davis also testified at the hearing. She again found it significant that, after three months of the father's absence, the mother and the stepfather decided that the father needed to be out of the children's lives and that the stepfather would assume the role of being the father. Davis observed that this was a very short window of time to make the determination that the father should be out of the children's lives. The mother and the stepfather were not yet married when this decision was made. Davis found that the father was sincere in his motives. He wanted to make things right and be involved in the children's lives. He thought that his former wife was a good mother and was appreciative of the stepfather.

Davis interviewed the children and found them to be shy and reserved. She said they did not have a very open dialogue. TM had memories of his father and had questions about why his father was not around anymore. TM wondered why he was not being allowed to visit the paternal grandparents as he had in the past. LM was two years old when the father and mother separated and three years old at the time of the last visitation with the father. Davis did not bring up the topic of the father with LM because he was too young. She did not know if LM had any memory of the father.

Davis was asked what would be in the best interest of the children. Although she acknowledged that the relationship with the stepfather appeared to be good for the children, she did not think that it would be in the best interest of the children to terminate the father's parental rights. Davis expressed concern, as a mental health professional, about the mother's

10

desire, early on, to exclude the father from the children's lives. Davis said the mother had a duty to talk to the father and tell him to step up and be involved with the children. Davis found that the mother did not do enough to foster or facilitate the relationship with the children during the father's absence. Davis said, "I think she could have done a lot more to reach out to [the father] if it's important in her opinion for those kids to know him as their dad. And that's where I think there is a problem. I don't know that she values him as their dad."

Davis said that kids have a right to know where they come from. While the stepfather may be paramount in the children's lives, biological family and the father's desire to be involved and to know his children should not be disregarded. She noted that the paternal grandparents wanted to be involved in the children's lives, and they got along well with the mother before this litigation started.

When Davis was questioned about the length of time that the father did not see the children or pay child support, she said that circumstances have to considered. Davis noted that the father had lost his job, filed for bankruptcy, and was disconnected from his family. Emotionally, he was in a dark place. He felt that, if he tried to contact the mother, she would have tried to put him in jail for failure to pay child support. "So he felt like he was in a Catch 22 situation with that." The court asked Davis whether the father had just cause for not seeing the children. She noted that he felt he was in a hopeless situation and was suffering from depression. She thought those factors should be considered.

Davis thought that the father should apologize, and the children and parents would need counseling. She thought it was a good thing that the

11

children were so young.  She was asked if the children would need counseling if their father did not come back into their lives.  She said, "They might."

The juvenile court listened carefully to the testimony and examined the evidence submitted in this matter.  The court then issued both oral and written reasons for judgment.  At the conclusion of the hearing, the court stated that it did not hold the failure to pay child support against the father because he named the mother as a creditor in his bankruptcy proceeding.  The juvenile court confirmed that the bankruptcy was ongoing and noted that payment of the child support obligation was stayed by the bankruptcy.  The mother chose not to enforce rights to the child support arrearage in the bankruptcy proceedings.  While the court found that the father could have done more to have a relationship with the children, he had a right to see the children that should not have been cut off from him.

In a "Written Order Denying Intrafamily Adoption" signed on June 8, 2020, the juvenile court reiterated the reasons previously given, and found that the mother interfered with the father's visitation, noting that the mother was angry and referred to the children as only "her children."  According to the court, the mother refused the father's requests to see the children, and the stepfather decided it was "time they moved on."  The juvenile court found that the mother knew where the father was the entire time and that she failed to take steps to collect child support arrearages in the bankruptcy proceedings, even though the father listed her as a creditor.  The suit for intrafamily adoption was dismissed and the matter was transferred to the district court for consideration of custody and child support.  A judgment dismissing the suit was signed June 11, 2020.

On July 1, 2020, the stepfather filed a motion for new trial, asserting that the juvenile court judgment was contrary to the law and evidence. He insisted that the evidence showed that the father had not seen or communicated with the children or paid child support since late 2016 and, therefore, the father's consent to the adoption was not necessary. This motion was denied as untimely on July 2, 2020. The stepfather filed another motion for new trial on July 15, 2020, pointing out that, considering the suspension of time limits during the COVID pandemic, the motion was timely. The juvenile court granted the motion for argument only. The father filed a motion to strike the new motion for new trial as untimely. The court set both motions to be heard on the same date.

The motion for new trial was heard on October 12, 2020. The juvenile court found that the second motion for new trial was timely. The stepfather argued that he clearly showed that the father did not contact the children or pay child support since 2016, and the juvenile court was constrained to find that the father's consent was not required for the adoption.

The father argued that Davis testified it would not be in the best interest of the children to terminate his parental rights. He also pointed out that the court had determined that he had just cause for not visiting or contacting the children because the mother alienated the children from him and thwarted his visitation. The juvenile court took the matter under advisement.

On October 15, 2020, the juvenile court signed a written order denying the motion for new trial. The court noted that Davis, the expert witness in this case, found that the mother interfered with the father's

relationship with the children. The court found that the father did not abandon the children and the mother's interference prevented the father from having a positive relationship with the children. The court stated that its decision to deny the adoption had not changed. The motion for intrafamily adoption was dismissed. The stepfather appealed.

## CONSENT REQUIREMENT
## FOR INTRAFAMILY ADOPTION

On appeal, the stepfather argues that the juvenile court committed legal error and abused its discretion in failing to find that the father's consent to the adoption was unnecessary under La. Ch. C. art. 1245 because he failed to communicate with the children and failed to pay child support for six months without just cause. He also asserts that the juvenile court erred in denying his motion for new trial. These arguments are without merit.

### Legal Principles

Intrafamily adoptions are authorized by La. Ch. C. arts. 1170 and 1243, et seq. The persons who may petition for an intrafamily adoption are set forth in La. Ch. C. art. 1243, which provides in pertinent part:

> A. A stepparent . . . may petition to adopt a child if all of the following elements are met:
>
> (1) The petitioner is related to the child by blood, adoption, or affinity through the mother of the child or through a father who is filiated to the child in accordance with the Civil Code.
>
> (2) The petitioner is a single person over the age of eighteen or a married person whose spouse is a joint petitioner.
>
> (3) The petitioner has had legal or physical custody of the child for at least six months prior to filing the petition for adoption[.]

La. Ch. C. art. 1193 states in part:

> Unless rights have been terminated in accordance with Title X or XI, consent to the adoption of a child or relinquishment of parental rights shall be required of the following:

14

. . . .

(2) The father of the child, regardless of the child's actual paternity, if any of the following apply:

(a) The child is a child born of the marriage in accordance with the Louisiana Civil Code or its legal equivalent in another state[.]

Regarding the consent of a parent, La. Ch. C. art. 1244 provides in

part:

A. Except as otherwise provided herein, any parent may execute an authentic act consenting to the adoption of his child in an intrafamily adoption, including a waiver of service or notice for any subsequent proceeding.

B. If the parent of a child born of marriage is married to the stepparent petitioner and executes an authentic act of consent, he need not join in the petition nor be served with a copy thereof [.]

Opposition to an intrafamily adoption is governed by La. Ch. C. art.

1244.1, which provides in part:

A. A parent, whose rights have not been terminated in accordance with Title X or XI or who has not previously consented to the adoption in accordance with Article 1244, may oppose the adoption of his child by filing a clear and written answer and opposition to the adoption. The answer and opposition shall be filed with the court within fifteen days from the time of service of the filing of an intrafamily adoption petition.

Regarding instances in which parental consent to an intrafamily

adoption is not required, La. Ch. C. art. 1245 provides in pertinent part:

A. The consent of the parent as required by Article 1193 may be dispensed with upon proof by clear and convincing evidence of the required elements of either Paragraph B or C of this Article at the hearing on the opposition and petition.
. . . .

C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exists:

(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.

(2) The other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.

The failure of a parent to communicate with the child or to provide court-ordered support for the child without just cause represents a failure by the parent to foster the parent-child relationship and allows a stepparent to adopt the child. *See In re Puckett*, 49,046 (La. App. 2 Cir. 4/17/14), 137 So. 3d 1264. An intrafamily adoption terminates parental rights of the biological parent who has failed to contact and/or support the child without just cause. *See* La. Ch. C. art. 1256; *In re D.L.D.*, 53,758 (La. App. 2 Cir. 1/13/21), 310 So. 3d 314. To constitute "just cause," a parent's failure to visit or communicate with his child must be due to factors beyond his control. *In re Morris,* 39,523 (La. App. 2 Cir. 1/26/05), 892 So. 2d 739. Louisiana courts have found that, when a stepparent and the parent with custody have hindered the attempts of the natural father to visit or communicate with his child, the father may be excused for otherwise failing to do so. *In re Puckett*, *supra*.

The party petitioning the court for adoption carries the burden of proving that a parent's consent is not required under the law by clear and convincing evidence. Once a prima facie case is proven, the burden of proof shifts to the nonconsenting parent to show that his failure to visit the children or to comply with the child support order was due to factors beyond his control. *In re D.L.D.*, *supra*; *In re B.J.C. Applying for Intrafamily Adoption*, 51,110 (La. App. 2 Cir. 9/28/16), 206 So. 3d 337.

16

Even if the parent's failure to visit, communicate or attempt to communicate with the children, or to pay court-ordered child support, for a period of at least six months, was without just cause, the judge nonetheless must determine whether the proposed adoption and consequent severance of the parental relationship are in the best interest of the child. *See Adoption of Latiolais*, 384 So. 2d 377 (La. 1980); *In re D.L.D.*, *supra*; *In re Leitch*, 32,021 (La. App. 2 Cir. 3/31/99), 732 So. 2d 632; *In re K.L.H.*, 1999-1995 (La. App. 3 Cir. 9/20/00), 771 So. 2d 706. The basic consideration in an intrafamily adoption is the best interests of the child. La. Ch. C. art. 1255; *In re Puckett*, *supra*. Whether an adoption is in a child's best interests must be decided on the unique facts of each case, and the trial judge is vested with vast discretion in making that determination. *In re Morris*, *supra*. Because the trial court judge is in a better position to make the best interests determination, this court will ordinarily not second-guess such sensitive decisions. However, the trial judge's discretion is not absolute, as the court's decision is subject to reversal if found to be manifestly erroneous or clearly wrong. *In re Puckett*, *supra*.

In determining whether intrafamily adoption is in the child's best interests, the court needs to take into consideration that the legal consequences of adoption are abrupt, severe, and irrevocable: the relationship between the child and natural parent is severed. In making the determination, it is not enough to look at the love and home environment provided by the stepparent. The court should also consider the depth and closeness of the child's ties with the noncustodial natural parent and the effect the loss of this relationship would have on the child. Children have a right to know and love their parents and should not be denied this right,

except when the parent has proven himself unworthy of their love. *In re Puckett*, *supra*; *In re Morris*, *supra*; *In re Leitch*, *supra*. While the natural parent's failure to support the child is a factor to be considered, it is not a controlling factor. *In re Leitch*, *supra*.

A new trial shall be granted when the verdict appears clearly contrary to the law and evidence. *See* La. C.C.P. art. 1972. When considering a motion for new trial, the trial judge has wide discretion. *Killough v. Bituminous Cas. Corp.*, 28,329 (La. App. 2 Cir. 5/8/96), 674 So. 2d 1091.

### Discussion

According to the stepfather, he proved that the father had not communicated with the children or paid child support for a period of at least six months, thereby making a prima facie showing that the father's consent to the adoption was not necessary. Then, the burden shifted to the father to show that his failure was due to factors beyond his control. The stepfather argues that the father did not meet that burden. The stepfather seems to urge that bankruptcy was not just cause for failing to pay the support obligation and that the father did not show that his failure to communicate with the children was due to circumstances beyond his control.

The stepfather acknowledges that, even where a parent fails to make support payments or contact a child, the adoption must be in the best interest of the child. He asserts that the juvenile court erred in finding that the adoption was not in the best interest of the children in this case. He urges that he has emotionally and financially supported the children during the father's unjustified absence. He contends that he is the primary male figure in the children's lives, has provided for them financially, and Davis, the court-appointed expert, said that he was good for the children. He noted

Davis's testimony that, if the father was allowed to re-enter the children's lives, counseling would be required.

The stepfather argues that the juvenile court erred in failing to grant his motion for a new trial, maintaining that the court's decision was contrary to the law and evidence.

In his brief, the stepfather relies mainly on three cases to support his argument. In *In re Spillars*, 44,172 (La. App. 2 Cir. 1/14/09), 2 So. 3d 593, the mother failed to show that the father kept her from communicating with their child, and the stepmother demonstrated that the intrafamily adoption was in the best interest of the child. The facts of the present case are distinguishable from those in *Spillars*. The mother in the present case clearly prevented the father from having contact with the children.

In *In re Salmon*, 318 So. 2d 897 (La. App. 2 Cir. 1975), the father opposing the intrafamily adoption did not show that his failure to pay child support and his failure to visit or communicate with the children was due to circumstances beyond his control. The stepfather here contends that *Salmon* has facts and issues nearly identical to the present case. He claims that the father in *Salmon* remarried and filed for bankruptcy, and this court found that just cause did not exist for the father's failure to support his children. The argument of the stepfather in the present case is not persuasive. In *Salmon*, we found that the father's bankruptcy and *subsequent discharge* did not excuse his failure to pay child support. Even though his financial situation had changed since the child support order was entered, the father in *Salmon* did not make a reasonable effort to provide his children with a proportional amount of his lessened ability to pay. Here, although the father did not make child support payments after October 2016, he listed the

mother as a creditor in his bankruptcy based upon the child support arrearage. She failed to enforce her claim in the bankruptcy. Also, the father's bankruptcy was ongoing throughout the time the hearings were held in this case. Further, in this matter, the child support award appears to have been stayed pending the outcome of the proceedings. Although limited, the father in this case did make a minimal effort to provide some support for the children. Also, the record shows that the father was emotionally impacted by his financial reversal and the mother's refusal to allow him to see the children. There is ample testimony in this record that, due to this situation, he felt powerless to seek a reduction in child support or to file suit to enforce his visitation rights.

In *Knapp v. Adoption of Cotten*, 577 So. 2d 241 (La. App. 1 Cir. 1991), *writ denied*, 580 So. 2d 364 (La. 1991), the court found that adoption by the stepparent was not in the best interest of the child where the young age of the child, the distance between the father's and mother's residences, and the mother's refusal to allow visitation or communication prevented the father from fostering a meaningful relationship with the child. While the stepfather argues that *Knapp* supports his position, it actually supports the father's position. As set forth above, in the present case, the mother prevented the father from fostering a meaningful relationship with the children and sought to deprive the children of their paternal grandparents when they indicated that they were in favor of the father seeing the children.

The father in this case admitted that he did not pay his court-ordered child support for a period of at least six months. In effect, the juvenile court found that there was just cause for the nonpayment, saying that the court would not hold the nonpayment against the father. He filed for bankruptcy

20

approximately six months after the last time he saw the children in October 2016, and within several days of the date the divorce became final. He listed the mother as a creditor, based upon the child support arrearage, and she was furnished with information to enforce the claim. She chose not to do so. We also note Davis's testimony that, following the divorce, the loss of his job, his alienation from his own father, and the mother's efforts to prevent visitation with the children, the father was depressed and "in a dark place." Davis urged that the circumstances should be considered. While failure to pay child support is a serious matter, the juvenile court was not clearly wrong or manifestly erroneous zin refusing to find that the father's consent for the adoption was not necessary, under the facts present in this case, based upon his nonpayment of child support for a period of at least six months.

The record shows that the father did not visit, communicate with, or attempt to communicate with the children for a period of at least six months. However, the juvenile court found that there was just cause for this failure. As noted by the juvenile court, after the separation, the mother consistently denied the father access to the children and thwarted his attempts to have a relationship with them. The facts of this case, as set forth above, demonstrate the extreme measures the mother took to prevent the father from having a relationship with the children. The record shows that the father was trying to maintain contact with his children, but the mother's interference made it impossible. The mother was willing to allow the paternal grandparents to see the children as long as they had no contact with the father. This divorce was unpleasant, as most are, and the mother decided to manipulate the situation to erase the father from the children's lives. As stated above, children have a right to know their parents, except when the

21

parent has proven himself unworthy of their love.  There is no showing that

the father has proven himself unworthy of the children's love, as argued by

the stepfather.  The mother's actions hindered the father's attempts to

contact and visit the children and to build a relationship with them.  Based

upon the facts of this case, the juvenile court was not manifestly erroneous

or clearly wrong in determining that the father had just cause for his failure

to visit, communicate, or attempt to communicate with the children for a

period of at least six months.

The record also supports the juvenile court's finding that granting this

intrafamily adoption would not be in the best interest of the children.  The

older child remembered the father and had questions about what happened to

him.  Both children had a strong relationship with the paternal grandparents.

TM had questions about why they were no longer allowed to visit in their

home.  The stepfather testified that, if the adoption was not granted, he

would still be involved in the children's lives.

Both parents in this case made mistakes in dealing with the children.

The juvenile court found it would be in the best interest of the children to

give the father a chance to make amends.  As stated by Davis, this will

require counseling.[2]  It will also require cooperation by the parents and

recognition by the mother that she must abide by the court order regarding

visitation and cease interference with the father's relationship with the

children.  The mother will have to accept that the children are not hers alone,

and that she may not have them with her for every holiday.  The father must

---

[2] Contrary to the stepfather's argument in his brief, Davis did not say that counseling would be unnecessary if the father failed to re-enter the children's lives.  She said that, in that situation, they "might" need counseling.

22

pay his child support obligation and must work hard to re-establish a close and loving relationship with his children.  Both parents must recognize that the best interest of the children must come first in their lives, not their own self-interest.  The juvenile court was not manifestly erroneous or clearly wrong in determining that adoption would not be in the best interest of the children.

Based upon this record, the juvenile court did not err in denying the stepfather's motion for new trial.  The juvenile court's ruling was not contrary to the law and the evidence.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court judgment denying the stepfather's request for an intrafamily adoption of TM and LM. We also affirm the juvenile court's denial of the stepfather's motion for new trial.  All costs in this court are assessed to the stepfather, RAL.

**AFFIRMED**.